**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| **TANYA WELLS, ON BEHALF** | : | |
| **OF HER MINOR CHILD, S.G.,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **YOLANDA THOMAS, ON BEHALF** | : | |
| **OF HER MINOR CHILD, J.G.,** | : | |
| | : | |
| **Plaintiffs** | : | **Civil Action Number: 16-cv-00901-ESH** |
| | : | |
| **v.** | : | |
| | : | |
| **DONALD L. HENSE**, *et.al.* | : | |
| | : | |
| **Defendants.** | : | |

=================================

### PLAINTIFFS' OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

TANYA WELLS, on behalf of her minor child S.G. and YOLANDA THOMAS, on behalf of her minor child J.G., by and through undersigned counsel, Billy L. Ponds, of The Ponds Law Firm, respectfully submit the Plaintiffs' Opposition to the Defendants' Motion to Dismiss Plaintiffs' Complaint and respectfully request that this Court enter an Order denying the Defendants' Motion to Dismiss the Complaint. In support thereof, plaintiffs state as follows:

The plaintiffs, in their Complaint have set forth specific and detailed facts to support the claims asserted therein, including but not limited to, the assertions that the defendants violated the rights of plaintiffs secured under Title IX and violated their constitutional right to equal protection under the laws. In addition, defendants' egregious conduct gives rise to their liability for gross negligence and the negligent infliction of emotional distress upon plaintiffs.

In their Motion to Dismiss the Complaint, the defendants rely on numerous persuasive authorities from across the entire United States in an attempt to frame their defense as having

strong precedential support. However, a closer examination of the cases defendants' relied upon, and the binding law in D.C., will demonstrate that all of the plaintiffs' claims are sufficiently pled to survive a 12(b)(6) motion to dismiss.

For the reasons set forth in the Memorandum of Law, the plaintiffs submit that their Complaint asserts claims upon which relief can be granted and the defendants Motion to Dismiss the Complaint should be denied in its entirety.

## I.     SUMMARY OF FACTS

At all relevant times herein, S.G. and J.G. attended the Friendship Collegiate Academy Public Charter School ("Academy") and were tenth grade students. On Tuesday, May 19, 2015, S.G and J.G. reported to their assigned classroom at approximately 1:00 pm for their math class. The math teacher, Gregory Harris, was not at the academy to teach the math class due to a regularly scheduled medical appointment to treat a knee condition. Mr. Harris was treated every other Tuesday for this condition. No substitute teacher reported to the math classroom, and no other teacher or school official ever reported to the classroom to teach or supervise the students. ¶¶ 28-35. An Academy student, D.B., skipped his foreign language class, which was held in the classroom next door to S.G. and J.G.'s math classroom, and entered the math classroom. While the math class was unsupervised, some students were in the front area of the classroom talking to one another while J.G. and S.G. remained at the back of the classroom. ¶¶ 36-41. D.B. approached S.G. at the back of the classroom and grabbed her left arms above her wrist. S.G. tried to resist D.G.'s actions by telling him to "move, stop and don't touch me." D.B. ignored S.G.'s pleas to leave her alone and restrained S.G. by forcefully holding her hair. D.B. then maneuvered her body to bend her over a table, and engaged in unwanted sexually offensive conduct towards her. S.G. tried, but could not escape. D.B. stood behind S.G. and performed a grinding and thrusting sexual

act against S.G.'s will. Five minutes later, D.B. approached S.G. a second time and forcefully bent her over again, and performed the same unwanted sexually offensive act as previously described herein. ¶¶42-50. At the same time D.B. approached S.G. the first time, E.E., an Academy athlete, approached J.G., who stood by a table at the back of the room. E.E. restrained J.G. by forcefully holding her hair and maneuvered her body to bend her over the table. J.G tried, but could not escape. E.E. bent J.G over the table and engaged in unwanted sexually offensive conduct towards her, by behind J.G. and performing a grinding and thrusting sexually offensive act against J.G.'s will. ¶¶50-56. After D.B. and E.E. finished performing the sexually offensive act towards S.G. and J.G. they walked to the area of the room where a group of students were gathered. The students in the math classroom observed these sexual assaults and neither intervened to stop D.B. and E.E. from engaging in the sexual acts described herein, nor did those students, at the time of the incident, notify any school official of the incident that had occurred. ¶¶ 57-60.

There was no security guard or hall monitor in the hallway in the vicinity of the math classroom to prevent D.B. from entering unassigned classrooms, or to stop the sexual offense as described herein that D.B. and E.E. committed against S.G. and J.G., respectively. Defendants failed to ensure that on May 19, 2015, from 1:00 to 2:30 pm students were supervised, and failed to recognize that D.B. left his assigned classroom and entered another classroom that was not part of hic lass schedule set by the Academy. ¶¶61-67. As a part of defendant Hense's responsibilities, he had a duty to the students to ensure their safety and that the Academy was properly staffed with teachers, monitors and security personnel. Furthermore, he had a duty to the students to take every precaution necessary to ensure the safety of the children and that they were not subjected to dangerous conditions. ¶¶68-73.

During her break between math and chemistry class, J.G. told another friend, S.T., about

the sexually offensive act, assault and battery, D.B. committed against S.G. against her will and E.E. committed against her during math class. In S.G. and J.G.'s next scheduled class, chemistry, several students gossiped about the sexually offensive act described herein. S.G. and J.G. did not report the unwanted sexually offensive acts as described herein because they did not trust any of the Academy officials or administrators. ¶¶81-83.

The day after the incident, S.G. met with her weekly mentoring group, SNEAKERS, and mentioned that something happened to her on May 19, 2015, during the math class. S.G. remained after the session had concluded and spoke to Tiffany Green, who ran the SNEAKERS program, in private, about the sexual assault D.B. committed against her twice on May 19, 2015. J.G. also told Tiffany Green about the sexually offensive incident. Tiffany Green reported the incident to Ms. L. Jones, an Academy official, who then reported the incident to the Academy Principal, Peggy Jones. ¶¶84-91.

On May 20, 2015, an Academy representative contacted S.G.'s mother, Tanya Wells, as well as J.G's mother, Yolanda Thomas, and they were notified of the sexual assault that D.B. committed against S.G. and E.E. committed against J.G. Tanya Wells and Yolanda Thomas immediately reported to the Academy to meet with school officials. During the meeting, school officials informed them that D.B. was involved in a fight at school on May 18, 2015, and that the Academy wanted to suspend D.B. and E.E. due to their misconduct. The Academy official stated that calls were made to initiate D.B and E.E.'s suspension, and that they would also be arrested for the acts they committed against S.G. and E.E. However, D.B. and E.E. were not suspended for their misconduct on May 18 or 19, 2015, and upon information and belief no corrective or disciplinary action was taken against them. ¶¶92-96. Defendants Friendship, Academy and Hense failed to take any action to correct, reprimand or discipline D.B. or E.E. for the misconduct they

engaged in, as described herein. Defendants Friendship and Academy did not take immediate and appropriate steps to investigate or determine what occurred; their investigation and the investigation by MPD were both incomplete as they failed to interview every witness present in the incident described herein. Defendants Friendship and Academy further failed to take any interim steps to protect S.G. and J.G from repercussions by D.B. and E.E., during or after the investigation, leaving them susceptible to psychological and emotional trauma, and even to further harassment by their peers. Defendants Friendship, Academy and Hense did not attempt to enforce any policy that would discourage sexual harassment and assault. ¶¶97-105. Subsequent to the offensive sexual act, S.G. and J.G. stopped attending classes because D.B. and E.E. were at the Academy, and due to the retaliation against them from other students and the defendant's failure to curtail the harassment and foster a safe, suitable and non-hostile learning environment. S.G. and J.G. were forced to complete their remaining class assignments for the academic year from home, and did not participate in their final exam review session; they only returned to the Academy for a brief period of time to take their final exams. Moreover, S.G. and J.G. both experienced a significant drop in four (4) out of six (6) of their classes from quarter three (3) to quarter four (4). ¶¶108-111.

Numerous Academy students gossiped about the sexual acts D.B. and E.E. had committed against S.G. and J.G.. Moreover, numerous students ostracized S.G. and called her a snitch. One particular student bullied S.G. on two separate occasions for reporting the incident to the academy officials. Another student confronted S.G. and called her a derogatory name, told her that she didn't know what she was talking about, and that it would be her fault if D.B. was reprimanded, disciplined or arrested; this student also called S.G. a snitch. S.G. and J.G. were made pariah's as a result of the defendant's failure to address and prevent other Academy students from engaging

in harassing and bullying conduct because they reported the offensive sexual assault described herein. ¶¶114-119. S.G. and J.G. informed an Academy official about the comments that other students made about the incident and they were told that the students' conduct would be reported. Nevertheless, no actions were taken by the defendants against the students who made the harassing and derogatory comments to S.G. and J.G. By failing to take any action to condemn the actions of such students, defendants tacitly condoned the unwanted sexually offensive acts, assault and battery, that D.B. and E.E. committed against S.G. and J.G., respectively, and the harassment and bullying to which they were subjected to subsequent to the sexual assaults. ¶¶120-123. S.G. and J.G. were psychologically and emotionally traumatized as a result from the acts committed by D.B and E.E., and the lack of defendants' response to it.  J.G. suffered from nightmares that E.E. was chasing and attacking her. Furthermore,  they have been psychologically and emotionally traumatized as a result of the defendants' failure to protect them before, during and after the investigation and their failure to take any reasonable action against D.B. and E.E. S.G. and J.G. were also psychologically and emotionally traumatized because D.B. and E.E. bragged about the sexual act they committed, as described herein. ¶¶123-130. S.G. and J.G. further feared that they would be blamed for the incident that occurred, and feared that the rumors about the subject incident would affect relationships with other Academy students. S.G. and J.G. are still suffering from psychological and emotional trauma and distress from all of the events that occurred as a result of the subject incident described herein. ¶¶131-139.

During the time of the incident and the subsequent investigation, defendants Friendship and Academy were receiving federal funding, as contemplated by Title IX, 20 U.S.C. §1681, et seq. Defendants Friendship and Academy had final policymaking authority, and executed and implemented policies and customs in regard to the events that resulted in the deprivation of S.G.

and J.G.'s constitutional, statutory and common-law rights, as all defendants, S.G., J.G., D.B. and E.E. were all subject to the school policies, rules and regulations. ¶¶140-144. Defendants Friendship and Academy adopted an anti-harassment policy contained in the Parent/Student Handbook, which defines harassment to include "references made to a person or group based upon age, sex, race, religion or ethnic origin. Verbal comments, sexual name-calling, gestures, jokes, slurs or spreading sexual rumors directed toward an individual or group is also considered harassment. Sexual harassment is unwelcome sexual advances, request for sexual favors, or other unwelcome verbal or physical contract of a sexual nature." Defendants Academy and Hense are responsible for ensuring that all of its employees enforce Friendship and the Academy's rules, regulations and policies. ¶¶145-150.

On May 20, 2015, and the remainder of the school year, D.B. and E.E. attended their classes at the Academy. Defendants' negligent failure to discipline D.B. and E.E. for their unlawful conduct that violated Academy policy supports a conclusion by the student body that S.G. and J.G. were untruthful or exaggerated the sexual assault D.B. and E.E. committed against S.G. and J.G. This gave the impression that the defendants called into question S.G. and J.G.'s integrity, sexuality, sexual behavior and their character for bringing the sexual assault to the attention of school officials. ¶¶151-156. The Parent/Student Handbook classifies the "Sexually Based Infraction" of committing, or attempting to commit, an act of sexual assault as a "Class 3 Infraction", which requires an "Administrator Response or Long Term Suspension (6 to a maximum of 20 days) and Possible Recommendation for Expulsion. Defendants Friendship and Academy both failed to follow this policy by taking no disciplinary action against assailants D.B. and E.E. Moreover, defendants Friendship and Academy negligently failed to comply with its statutory responsibility under Title IX to respond to the sexual assault in an effort to keep the

sexual assault and violence on the school premises from becoming public through the discipline of D.B. and E.E. Defendants Friendship and Academy also failed to provide any investigation findings to Wells and Thomas and never informed them of their available recourse. ¶¶ 157-160.

Failure to lead an investigation and subsequently discipline D.B. and E.E. resulted in personal damages for S.G. and J.G., which include but are not limited to, psychological and emotional distress, loss of standing in their community, and damage to their reputation, which were not addressed by defendants Friendship and Academy. The incident, and the defendant's response described herein, further deprived S.G. and J.G. from education opportunities and benefits of the school, as they were afraid to attend their classes. ¶¶161-167. S.G. and J.G. required mental health counseling to, including but not limited, cope with the aftermath of the sexual assault, the emotional stress and distress, their feeling that they had done something wrong and defendants Friendship and Academy's failure to discipline D.B. and E.E. The aftermath of the such aftermaths escalated upon S.G. and J.G.'s return to the Academy for the 2015-2016 school year as the Academy neither disciplined D.B. and E.E. nor changed their boundaries to ensure the protection of S.G. and J.G. Such response by defendants Friendship and Academy would make reasonable students who encountered or were confronted with the same or similar circumstances as the one described herein, to be reluctant to report sexual harassment. ¶¶168-170.

## II.     MEMORANDUM OF LAW

### A.  Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." In evaluating Defendants' Motion to Dismiss, the Court must "treat the complainant's factual allegations as true… and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow*

*v. United Airlines*, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (*quoting Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citations omitted); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The notice pleading rules are "not meant to impose a great burden on a plaintiff," *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), and she must thus be given every favorable inference that may be drawn from the allegations of fact. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *id.* at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (*quoting Papasan v. Allain*, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)). Though a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," *Twombly*, 550 U.S. at 555 (*citing Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Id.*

But at this stage of the litigation, the Plaintiff need only supply "a short and plain statement of the claim showing that the pleader is entitled to relief," FED.R.CIV.P. 8(a), which he has done. *See, e.g., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed. 2d 1 (2002); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113

S.Ct. 1160, 122 L.Ed.2d 517 (1993). While the court does not have to accept conclusions of law as true, conclusions of fact are another matter. *Warren v. D.C.*, 353 F.3d 36, 39 (D.C. Cir. 2004).

A court should dismiss a complaint for failure to state a claim only if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662; 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a facially plausible claim, a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *Rudder v. Williams* (D.C. Cir. 2012).

Plaintiffs' complaint alleges sufficient facts for the court to draw a reasonable inference that the defendants violated S.G. and J.G.'s rights. The Complaint sets forth a clear and obvious list of allegations and facts that demonstrate that defendants' actions deprived S.G. and J.G. of educational opportunities in violation of their rights under Title IX. Additionally, the Complaint lays out ways in which S.G. and J.G. were retaliated against due to their reporting of a sexual assault that they had to endure at school. Finally, the Complaint describes the acts and omissions of defendants, leading up to, during, and after the sexual assault, that give rise to their liability for gross negligence and the negligent infliction of emotional distress upon plaintiffs.

### B. Plaintiffs' Title IX Claim (Counts I and II)

The plaintiffs assert that defendants' acts and omissions subsequent to the sexual assault committed against plaintiffs on May 19, 2015, while they were in their assigned classroom, unsupervised, while school was in session, constitutes deliberate indifference to a hostile environment in violation of Title IX. Defendants argue that they took reasonable steps in responding to the sexual assault; however, plaintiffs assert that the defendants' failure to do virtually anything that they were required to under Title IX provides strong evidence that could

lead a reasonable jury to find that defendants' response was clearly unreasonable under the circumstances and therefore constitutes deliberate indifference.

Plaintiffs assert more than mere procedural violations of administrative Title IX provisions; rather, plaintiffs argue that defendants' acts and omissions subsequent to the sexual assault were so deficient that they frustrated the main goal and purpose of Title IX, to provide equal educational opportunities to all students. Specifically, plaintiffs assert that defendants failed to do a serious investigation into the incident (See Plaintiffs' Complaint, ¶¶ 99, 155-159), failed to properly inform the affected parties of the process and progress of any investigation, were intentionally deceitful in their statements to the victims (See Plaintiffs' Complaint, ¶¶ 93-99, 160), failed to take any disciplinary or corrective action against the perpetrators (despite the fact that defendants in no way deny that the incidents plaintiffs described in their Complaint occurred) (See Plaintiffs' Complaint, ¶¶ 93-99, 151), failed to follow their own policy regarding sexual harassment (See Plaintiffs' Complaint, ¶¶ 93-105, 145, 186-189), failed to do virtually anything to protect the victims of the sexual assault (See Plaintiffs' Complaint, ¶¶ 93-130, 186-189), and created a hostile environment that allowed other students to ridicule, bully, harass and retaliate against the victims of the sexual assault due to their reporting of the incident (See Plaintiffs' Complaint, ¶¶ 114-123, 186-189). While one of these acts or omissions might not independently give rise to a Title IX violation, when taken together as the totality of circumstances, it is clear that defendants have violated the Title IX rights of the plaintiffs as their deliberate indifference to the sexual assaults has deprived plaintiffs of educational opportunities.

The Supreme Court specifically addressed the issue of Title IX liability for student-on-student harassment in *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629 (1999). In their opinion, the court set forth the four elements required to find Title IX liability for student-on-student

harassment: 1) the plaintiff was a student at an educational institution receiving federal funds (See Plaintiffs' Complaint, ¶¶ 9-12); 2) the plaintiff was subjected to harassment based on her sex (See Plaintiffs' Complaint, ¶¶ 175-198, 207); 3) the harassment was so severe, pervasive, and objectively offensive that it created a hostile or abusive educational environment (See Plaintiffs' Complaint, ¶¶ 106-129, 175-185); and 4) the educational institution had actual knowledge of the harassment but was deliberately indifferent to it (See Plaintiffs' Complaint, ¶¶ 91-123, 171, 175-189, 216). *Id.* at 650. The Supreme Court in *Davis* indicated that deliberate indifference before or after the attack must "at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." *Id.* at 645. (internal quotations omitted). Therefore, "A Title IX violation can be based on deliberate indifference before an attack that makes a plaintiff more vulnerable to the attack or, in certain circumstances, deliberate indifference after an attack that causes a plaintiff to endure additional discrimination." *Doe v. Bibb Cty. Sch. Dist.*, 126 F. Supp. 3d 1366, 1376 (M.D. Ga. 2015).

The plaintiffs at this time are not alleging that defendants were deliberately indifferent prior to the sexual harassment and assault that plaintiffs were subjected to on May 19, 2015, as upon information and belief, they agree with the defendants that there was no actual notice of a hostile environment prior to this incident[1]. The plaintiffs' argument focuses on defendants' acts and omissions subsequent to the sexual assaults against S.G. and J.G. on May 19, 2015, that resulting harassment and vulnerability to harassment was caused by the defendants' deliberate indifference. Using the language of the Supreme Court in *Davis,* the defendants "intentionally acted in clear

[1] This is based upon the current information available to plaintiffs. Upon the conclusion of discovery, the plaintiffs reserve the right to allege that defendants were deliberately indifferent to a hostile environment prior to the May 19, 2015 assault if there is sufficient evidence to establish that a hostile environment existed prior to the sexual assaults against S.G. and J.G.

violation of Title IX by remaining deliberately indifferent to acts of… harassment of which it had actual knowledge." *Id.* at 642. This deliberate indifference prevented S.G. and J.G. from being able to attend school after the assaults (Plaintiffs' Complaint, ¶108), prevented them from being able to attend review sessions for their final exams (Plaintiffs' Complaint, ¶109), caused them to experience psychological and emotional trauma (Plaintiffs' Complaint, ¶¶124-133) and caused their grades to drop significantly (Plaintiffs' Complaint, ¶¶110-111).

1. **The Defendants' Response was "Clearly Unreasonable In Light of the Known Circumstances"**

"Deliberate indifference is based on how a funding recipient responds to *known* circumstances." *Doe v. Bibb Cty. Sch. Dist.*, 125 F. Supp. 3d at 1378. The Supreme Court in *Davis* stated that a school must "respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 649. The Supreme Court adopted this standard in order to provide one that "is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action." *Id.* The majority in *Davis* set this standard in response to the dissent's mischaracterization of the standard for student-on-student harassment, as seen in the following excerpts:

> In search of a principle, the majority asserts, without much elaboration, that one causes discrimination when one has some "degree of control" over the discrimination and fails to remedy it. *Davis*, 526 U.S. at 662. (Kennedy, J., dissenting)

> The majority's holding would appear to apply with equal force to universities, which do not exercise custodial and tutelary power over their adult students. *Davis*, 526 at 667. (Kennedy, J., dissenting)

This "clearly unreasonable in light of the known circumstances" test is meant to incorporate the totality of circumstances surrounding incidents to determine if the school has met their Title IX burden in their response to the incident, rather than some blanket requirement that schools remedy all peer harassment. The test aims to evaluate the schools' response, in light of their degree of control and circumstances in which the incident occurred (time, place, location, etc.) to see if the school has satisfied their burden under Title IX to ensure that students are not "excluded from participation in, denied the benefits of, or be subjected to discrimination under any education program or activity." 20 U.S.C. §1681(a).

In the plaintiffs' case, it is uncontested that defendants had actual notice of three sexual assaults that took place in an unsupervised classroom on May 19, 2015: two sexual assaults against S.G. and one against J.G. (Plaintiffs' Complaint, ¶¶ 91-99). In defendants' Motion to Dismiss they make no argument challenging this fact. Additionally, defendants had actual notice of subsequent harassment that took place when S.G. and J.G. tried to resume classes at the Academy after the sexual assaults (Plaintiffs' Complaint ¶120), and they make no argument challenging this fact. In their Motion to Dismiss, the only response that defendants argue they took is: 1) Contacting the parents of S.G. and J.G.; 2) Performing an "investigation", and allegedly they "involved the MPD"; and 3) They "allowed" S.G. and J.G. to complete their remaining assignments at home. Plaintiffs do not believe that this response is sufficient enough that a reasonable jury could not find it to be "clearly unreasonable in light of the known circumstances."

The fact that defendants make no attempt to argue that they took any additional action to respond to the incidents supports the fact that they believe the following is an adequate way to respond to sexual assaults at high school: 1) Call the parents of the victims (¶ 92); 2) say they are performing an investigation (¶ 95); and then 3) if the students refuse to come back to school due

to a hostile environment, "allow them" to finish the year out by doing work on their own at home (¶¶ 108-109). In fact, defendants argue that this is not only an adequate response, but one that goes "above and beyond" what the law requires them to do (See Defendant's Motion to Dismiss, p. 14). Plaintiffs find it difficult to believe that any reasonable jury would find this response adequate, let alone as something "above and beyond" what is required.

In their motion the defendants attempt to shift the court's focus away from the main point that plaintiffs' are arguing: The school's response to the known circumstances surrounding the incidents of sexual assault and subsequent harassment are clearly unreasonable. Plaintiffs are not bringing this lawsuit because they are dissatisfied with a particular remedy, or because they sought some particular remedy that was not granted. Plaintiffs are not arguing that the school is liable under Title IX for merely failing to follow their established sexual harassment procedures and policies. Plaintiffs argue that the totality of the circumstances surrounding the incident, and the school's response, lead to what a reasonable jury will conclude is clearly unreasonable.

Defendants rely on a variety of persuasive authority in an attempt to establish that their response was not clearly unreasonable. However, a closer look at these cases, and the totality of circumstances surrounding the incidents within them, demonstrates that defendants' reliance on these authorities are misplaced, as they better serve plaintiffs' argument that defendants have responded in a manner that was clearly unreasonable in light of the known circumstances. One of the first cases defendants rely upon is *Doe v. Bibb Cty. Sch. Dist.*, highlighting the fact that the school district decided to turn an investigation into a sexual assault over to the local police. While the police may have been involved in plaintiffs' case, their involvement would be limited to determining if there is sufficient evidence to find probable cause of criminal liability for the sexual assaults; if the school is accepting as true the fact that these assaults occurred, which we previously

established they had, then the police investigation plays virtually no role in the Academy's response. By acknowledging that the sexual assaults did in fact occur, the onus to properly respond to the situation in a way that is reasonably calculated to protect the plaintiffs from harassment and foster a safe learning environment, preserving their access to educational opportunities, remains with the defendants; they have failed to do so in the plaintiffs' case.

The school in *Bibb Cty* did not simply hand the investigation over to the local police. The school "hired an outside company to conduct a safety audit, altered its internal policies, and implemented further safety measures. Additionally, the male students alleged to have participated in the sexual assault were in custody when the investigation was turned over and thus were not posing a current danger." *Doe v. Bibb Cty. Sch. Dist.*, 126 F. Supp. 3d at 1379. "The male students also received charged letters, which prevented them from returning to school upon release from custody." *Id.* The court in *Bibb Cty.* cited two Eleventh Circuit cases, and one First Circuit case, where the courts found that further discrimination "can be a response on the part of the funding recipient that is so ineffective it bars the victim's access to educational opportunities." *Id.* at 1380; (referencing *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007)). "Though deliberate indifference and denial of access to an educational opportunity or benefit are separate elements, the Eleventh Circuit in *Hill* cited the same type of conduct found to constitute "further discrimination" in *Williams*: clearly unreasonable conduct that effectively prevented the plaintiff from continuing to attend her school." *Id.* at 1381; (referencing *Williams v. Bd. of Regents of the Univ. Sys. Of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007) and *Hill v. Cundiff*, 797 F.3d 948, 976, 2015 BL 258920, 22 (11th Cir. 2015). Of the additional actions that the school in *Bibb Cty.* took, the defendants took none. Additionally, their representation that the court "refused to find" deliberate indifference solely based on the involvement of local police is inaccurate. The decision

in *Bibb Cty.* was the result of the court's analysis of the totality of the circumstances. In the plaintiffs' case, the fact that defendants did not respond in any way to protect plaintiffs, and plaintiffs were barred from educational opportunities and effectively prevented from attending school, indicates that under this precedent defendants' response would not pass the "clearly unreasonable in light of the known circumstances" test.

The defendants' reliance on *DeCecco v. Univ of S.C.* is puzzling, as it seems to in no way relate to the case at hand. In *DeCecco*, the court ruled that there was no deliberate indifference due to the fact that the court found no actual notice of discrimination, a required element for a Title IX claim. While it is true that the court found no deliberate indifference, and the school in that case invited the victim to file a formal complaint, the court did not find that the school's response was not clearly unreasonable in light of the known circumstances, as it did not undertake that analysis due to the absence of actual notice. The victim in *DeCecco* refused to file a formal complaint, which precluded the school from having the necessary information to respond to vague sexual harassment allegations. *DeCecco v. Univ. of S.C.*, 918 F. Supp. 2d 471, 495, 2013 BL 11534, 16 (D.S.C. 2013). This was not a case where the school found a sexual assault to have occurred, and then merely invited the victim to file a complaint.

In *KF v. Monore Woodbury* the steps that the school took were as follows: 1) recommended that the victim attend an out-of-district program; 2) provided the victim with individual tutoring so that she would not have to return to school; and 3) informed the victims' parents of the Title IX grievance procedures and invited them to file a formal grievance. *KF v. Monroe Woodbury Cent. Sch. Dist.*, 531 Fed. Appx. 132, 134, 2013 BL 228072, 2 (2d Cir. 2013). In the plaintiffs' case, the Academy did not offer any alternative programs for S.G. and J.G. to attend, did not provide S.G. or J.G. with individual tutoring, and did not invite the parents to file a formal grievance with a

Title IX officer. Instead, they met with the parents, told them that they would subsequently discipline the aggressors (which they did not do), and failed to take any further action.

*Ostrander v. Duggan* is not a relevant authority, as that involves a completely different scenario: a sexual assault at an off-campus fraternity. The court's analysis in that case takes into consideration circumstances that would not be present at a high school, and therefore it provides no insight into the analysis of whether or not a high school has responded to a sexual assault at the school, in a classroom, while school was in session, in a way that was clearly unreasonable.

In *Ross v. Univ. of Tulsa*, "TU conducted an investigation, held a student conduct hearing, and issued written findings setting forth reasons for its decision". *Ross v. Univ. of Tulsa*, No. 14-CV-484-TCK-PJC, 2016 WL 1545138, at *15 (N.D. Okla. Apr. 15, 2016). "TUCP obtained over fifteen witness statements from TU students regarding Ross's allegation and the 2013 incident. TUCP also investigated the 2012 Report by contacting and obtaining statements… TUCP prepared a report, which was provided". *Ross*, 2016 WL 1545138 at *16. It is clear that the court in Ross based its decision on the fact that the school took numerous actions in response to the complaint. The plaintiffs find no basis for the defendants' claim in their motion to dismiss that in *Ross* there was "no deliberate indifference when school only contacted the victim and took her statement". (Defendants' Motion to Dismiss, p. 15).

While "the failure to follow sexual harassment grievance procedures does not prove deliberate indifference under Title IX", *Gebster v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291-92 (1998), several courts have found the failure to follow procedures to be probative of deliberate indifference (see *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 211, 2009 BL 229312, 14 (D.N.H. 2009)); (see also *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 709 (E.D. Pa. 2007)); (see also *Michelle M. v. Dunsmuir Jt. Union Sch. Dist.*, No. 04-2411, 2006 WL 2927485,

at \*5-6 (E.D. Cal. Oct. 12, 2006)). The *Davis* Court indicated that we are to look at the response in light of the "known circumstances", and therefore we should incorporate in this analysis whether or not the school followed their policies and procedures. In the plaintiffs' case they did not. (Plaintiffs' Complaint, ¶¶151, 155-56, 178).

The U.S. Department of Education published guidelines on a school's duties and obligations under Title IX in April 2014. Department of Education, *Questions and Answers on Title IX and Sexual Violence*, (April 29, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf. This "significant guidance document" outlines the *basic* responsibilities a school has to address student-on-student sexual harassment. According to the Title IX Guidelines, when a school has notice of sexual harassment it must do the following (summarized from *Id.* at §A-5, p. 2-3):

> 1) Undertake an immediate investigation
> 2) If the investigation reveals sexual violence created a hostile environment, take prompt and effective steps reasonably calculated to end it, prevent its recurrence, and remedy it. The school should not wait to take steps to protect students until they have already been deprived of educational opportunities. Title IX requires a school to protect the complainant and ensure their safety, including taking steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation.
> 3) If the school determines sexual violence occurred, they must continue to take steps to protect the complainant and ensure their safety. The school should ensure the complainant is aware of any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services.
> 4) If the school delays responding to allegations of sexual violence, *or responds inappropriately, the school's own inaction may subject the student to a hostile environment. If it does, the school will also be required to remedy the effects of sexual violence that could have been prevented had the school responded promptly and appropriately.* For example, if a school's ignoring of a student's complaints of sexual assault by a fellow student *results in the complaining student having to remain in classes with the other student for several weeks and the complaining student's grades suffer because he or she was unable to concentrate in these classes*, the school may need to permit the complaining student to retake the classes without penalty (in addition to other remedies) to address the effects of sexual violence.

In the plaintiffs' case the Academy has taken virtually none of these steps. They apparently did some form of investigation, but upon information and belief this investigation only included speaking with the parents of the victims and the assailants. Regardless of how deficient their investigation was, they found that sexual assaults had occurred. The Academy took no steps to remedy a hostile environment (¶¶ 91-123, 171, 175-189, 216). S.G. and J.G. tried to return to school, but due to the fact that the school took absolutely no measures to protect or support them, and the hostile environment persisted, they were forced to leave school for the remainder of the semester. The school took no action, but merely agreed to "allow" S.G. and J.G. to finish their assignments from home (¶¶ 108-109). This meant S.G. and J.G. would not have the benefit of an instructor and would be on their own to learn the subject matter of the remaining lessons and prepare for finals independently. Other students at the Academy, including the assailants, got the educational benefit of continued in-class instruction, and a focused review session to help them prepare for finals (¶ 109). Unsurprisingly, S.G. and J.G.'s grades have suffered as a result of them being denied these educational benefits (¶¶ 110-111). Additionally, the fact that the hypothetical included in the Department of Education guidelines is wholly consistent with the fact pattern in plaintiffs' case speaks to the strength of plaintiffs' claim that a hostile environment existed and the Academy's response was grossly inadequate.

## 2. The Retaliation Plaintiffs' Were Subjected to is Actionable under Title IX

Defendants rely upon Title VII for their analysis of plaintiffs' Title IX retaliation claim. Their argument regarding retaliation appears to be that since the school, and their agents, were not the ones retaliating, the school cannot be liable because it took no materially adverse action against the plaintiffs. However, Title VII and Title IX have significant textual differences with regards to agency principles, as the Supreme Court noted in *Gebster* and *Davis*. (See *Davis*, 526 U.S. at 643);

(see also *Gebster v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 283 (1998)). The *Davis* court came to their conclusion that student-to-student sexual harassment is actionable under Title IX in part due to their finding that agency principles do not apply in a Title IX context. It logically follows that student-on-student retaliation for Title IX reporting would also be actionable under Title IX, just as student-on-student harassment would. As the Supreme Court put it in *Jackson v. Birmingham Bd. of Educ*, "Without protection from retaliation, individuals who witness discrimination would likely not report it, indifference to claims would be short circuited, and the underlying discrimination would go unremedied." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005). The Supreme Court in *Jackson* went on to discuss Title IX's enforcement scheme being dependent on individual reporting, due to the need to show actual notice, and that retaliation can serve as a way to subvert the statute's enforcement scheme. *Id.*

A finding of actionable student-on-student retaliation is also supported by the Department of Education guidelines on sexual harassment previously referenced. In §K-1 the DOE specifically states that when a school knows, or reasonably should know, of possible retaliation by other students or third parties, it has a duty to protect the complainant and witnesses and must respond promptly and appropriately to continuing or new problems. Department of Education, *Questions and Answers on Title IX and Sexual Violence*, (April 29, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf. Plaintiffs' have pled not only the numerous retaliatory actions taken against them by other students, but also the fact that they gave the school actual notice, and the school failed to take any action.

## C. **Plaintiffs' §1983 Claims (Counts III and IV)**

The defendants again rely on various persuasive authorities to argue that they are not state actors, and therefore cannot act under the color of state law. However, the law in D.C. indicates otherwise, as the Academy, a public charter school, is considered a state actor. The court in *Shelton v. Maya Angelou Public Charter Sch.* recognized that a D.C. public charter school can be a state actor for §1983 claims involving IDEA (Individuals with Disabilities Education Act). The court initially allowed the §1983 claim to proceed past summary judgment, but later dismissed the claim due to the plaintiff's failure to demonstrate that the school had a policy or custom that caused the IDEA violation. (see *Shelton v. Maya Angelou Public Charter Sch.*, 656 F. Supp. 2d 82, 85, 2009 BL 198671, 2 (D.D.C. 2009). Given that the D.C. District Court was willing to allow a §1983 claim that a public charter school violated a student's rights under IDEA to survive summary judgment, it logically follows that the court would also allow a §1983 claim of a Fifth Amendment violation by a Public Charter School to proceed past a motion to dismiss, at least with regards to the state actor inquiry.

Plaintiffs also assert that there is a significant enough similarity between public charter schools and private prisons in D.C. to find that public charter schools are state actors within the §1983 framework. The court in *Moonblatt v. Dist. of Columbia* found that even though CCA, a private corrections facility, did not have heavily regulated daily operations, the District did not retain any authority or responsibility for hiring, firing, or managing CCA's employees, and the CCA was less regulated than the school discussed in *Rendell-Baker* or the nursing home in *Blum*, the court found that a §1983 claim could proceed against them, and this holding has been followed in subsequent opinions. *Moonblatt v. Dist. of Columbia*, 572 F. Supp. 2d 15, 24, 2008 BL 161257, 8 (D.D.C. 2008); (see also *Smith v. Corrections Corp. of America, Inc.*, 674 F. Supp. 2d 201

(D.D.C. 2009); (see also *Harris v. Corrections Corp. of America*, 796 F. Supp. 2d 7 (D.D.C. 2011); (see also *Turner v. Corr. Corp. of Am.*, 56 F. Supp. 3d 32 (D.D.C. 2014). The court in *Moonblatt* applied the "close nexus test" to find that since the private correctional facility was performing activities that were "traditionally associated with the exclusive prerogative of the state", it could be consider a state actor in a §1983 claim. *Id.*

Although private schools have existed throughout our nation's history, a key distinction can be made to demonstrate that D.C. public charter schools are performing functions that are traditionally associated with the exclusive prerogative of the state. The court in *Riester v. Riverside Community Sch.* distinguished the school at issue in that case from the *Rendell-Baker* holding. The school at issue in *Rendell-Baker* "was brought into existence through the actions of private individuals and subsequently sold its services to the governmental bodies." *Riester v. Riverside Community Sch.*, 257 F. Supp. 2d 968, 973 (S.D. Ohio 2002). The school at issue in *Riester* "relied on the approval of the State Board of Education for its creation." *Id.* "The Court agrees with Plaintiff's argument that Defendants have been granted the authority to provide free public education to all students in a nondiscriminatory manner; no other entity, Plaintiff asserts, has been so mandated by the State of Ohio besides local school districts." *Id.* Just as in *Riester*, the Academy relied upon the D.C. Board of Education for approval of their charter, and other than D.C. public schools, no other entity has been mandated by D.C. to provide free public education to all students in a nondiscriminatory manner.

In order to state a claim for a §1983 violation, the plaintiff needs to allege: 1) a violation of their rights under the Constitution or federal law by a person acting "under the color of state law" and 2) the violation was a result of a municipal policy or custom. *Harvey v. Mohammed*, 841 F. Supp. 2d 164, 185, 2012 BL 19274, 16 (D.D.C. 2012). Plaintiffs need to also allege an

affirmative link to the policy or custom that was the moving force behind the constitutional violation. *Id.* The plaintiff may demonstrate such a municipal policy or custom based on the failure of the municipality to respond to a need in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations. *Id.* This deliberate indifference is determined by whether the municipality knew or should have known of the risk of constitutional violations, and objective standard. *Id.*

Plaintiffs are not asserting that the defendants' have a constitutional duty to protect plaintiffs from other students under some "state endangerment theory". Plaintiffs assert that their rights to personal security, bodily integrity and equal protection under the law were violated by the defendants, and this violation arose from the defendants' policy of failing to adequately train and supervise their personnel in responding to and preventing sexual assaults and harassment. The plaintiff also asserts that the defendants had a policy or custom of not adequately responding to sexual assaults and harassment. These policies led to the disparate treatment of plaintiffs and a deprivation of their educational benefits. Under this equal protection theory, plaintiffs do not need to satisfy the standard of substantive due process, which requires defendants to be deliberately indifferent to constitutional rights in a way that is so egregious or outrageous as to shock the conscience.

While plaintiffs, two girls, were precluded from attending school, and deprived of the educational benefits including in-class instruction and a final exam review, the two assailants, both boys, were able to attend school and enjoy the educational benefits of in-class instruction and a final exam review session. The plaintiffs were forced out of the school due to the defendants deliberate indifference to the hostile environment that was created subsequent to the sexual assaults against plaintiffs. This disparate treatment is the affirmative link between the defendants' custom

or policy of failing to train and supervise their personnel in responding to sexual assaults and the constitutional violation of plaintiffs' Fifth Amendment right to Equal Protection.

It is the defendants' own policy, not that of the District of Columbia, that is determinative of the first element for a §1983 claim. "[A] corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies. The proper test is whether there is a policy, custom or action by those who represent the official policy that inflicts injury actionable under § 1983". *Grissom v. Dist. of Columbia*, 853 F. Supp. 2d 118, 124, 2012 BL 263377, 6 (D.D.C. 2012); (citing *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993). The policy or custom of defendants of failing to adequately respond to sexual assaults at school exhibits deliberate indifference to plaintiffs, and other Academy students', rights to equal protection and rights under Title IX. These rights are clearly established, and were so at the time plaintiffs' rights were violated. "[M]unicipal liability under 1983 attaches where and only where a deliberate choice to follow a course of action is made from among various alternatives." *Gabriel v. Corrections Corp. of America*, 211 F. Supp. 2d 132, 138 (D.D.C. 2002); (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). The plaintiffs were not seeking a particular remedy, only a response that reasonably protected them from future attacks from their assailants, while still affording them the same educational opportunities and benefits as other similarly situated students. The defendants made a deliberate choice to not do this, and only "allowed" the plaintiffs to finish their assignments from home. While this may have removed plaintiffs from any immediate physical harm, it denied them equal access to educational opportunities that were afforded to other similarly situated students.

In *Turner v. Corr. Corp of Am.*, the court listed various ways to find an affirmative link between the custom or policy and the constitutional violation: 1) the explicit setting of a policy by

the government that violates the constitution; 2) the action of a policy maker within the government; 3) the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become custom; 4) the failure of the government to respond to a need… in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in a constitutional violation…. Pleading deliberated indifference, furthermore, requires a plaintiff to allege that corporate officers knew about the risk of a violation of constitutional rights and did nothing. *Turner v. Corr. Corp. of Am.*, 56 F. Supp. 3d 32, 36, 2014 BL 199726, 3 (D.D.C. 2014). Here, the plaintiffs allege that the action of policymakers within defendants Friendship and Academy caused the violations, as their conscious choice to not properly respond to the incident directly and proximately caused the violation of plaintiffs' rights to equal protection. Additionally, plaintiffs argue that there was an adoption through a knowing failure to act by a policymaker of actions by his subordinates that are so consistent to become custom (See Plaintiffs' Complaint, ¶182). Plaintiffs also argue that defendants Friendship and Academy failed to respond to plaintiffs' needs, specifically the needs to have access to all of the educational benefits as other similarly situated students and their need to be able to learn in an environment that is not hostile, in such a way that constitutes the defendants' deliberate indifference to the risk of a violation of plaintiffs constitutional rights. Defendants also failed to respond to the need to adequately train their employees in responding to sexual assaults and harassment. *Baker v. Dist. of Columbia,* 326 F.3d 1302, 1307 (D.C. Cir. 2003); (using the example of failing to train employees as failure to respond to a need). The plaintiffs' rights were not violated by the single action or inaction of one of defendants' employees; their rights were violated as a direct and proximate result of defendants' policy or custom of failing to adequately respond to sexual assaults and harassment.

### D. **Plaintiffs' Gross Negligence Claim (Count V)**

In order to prove a claim of gross negligence, plaintiff needs to plead facts sufficient to demonstrate that "a person is acting with a wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." *District of Columbia v. Walker*, 689 A.2d 40 (D.C. 1997). This is a negligence where there has been a "failure to exercise even slight care", and is such that it "would shock fair minded men". *Shea v. Fridley*, 123 A.2d 358, 363 (D.C. 1956). Although the standard has sometimes been held to connote the actor engaged in conduct that implies some sort of bad faith, plaintiffs may alternatively show the extreme nature of conduct by demonstrating that the actor acted in disregard of a risk "so obvious that [the actor] must be taken to be aware of it and so great to make it highly probable that harm would follow." These fact-based considerations "necessarily result in each case turning on its own peculiar circumstances. Generally, whether conduct constitutes gross negligence is a question of fact for the jury." *Walker*, 689 A.2d at 51. (Wagner, dissenting); (citing *District of Columbia v. Banks*, 646 A.2d 972, 983 (1994)).

Plaintiffs' gross negligence claim incorporates the conduct of defendants that led up to the sexual assaults on May 19, 2015. This includes: 1) defendants failed to have any system in place to verify that teachers or other individuals qualified to supervise students were in each classroom students were assigned to report to;  2) defendants failed to have any effective system in place to verify that students were in the classrooms that they were assigned to be in; 3) defendants knew or should have known that one of the assailants, E.E., had a propensity for violence and misconduct; and 4) defendants failed to have any security guard or hall monitor in the vicinity to prevent anyone unauthorized, including students or members of the general public, from entering classrooms where students were present. (See Plaintiffs' Complaint, ¶¶61, 64, 66, 67, 68, 71, 76, 79, 211-228).

The Academy is an inner city public school in a major metropolitan area of the United States, and given the history of tragedies that have taken place in public schools even when the schools are diligent, plaintiffs assert that a reasonable jury could find that defendants' misconduct was such that there was a high probability that harm would follow. Plaintiff asserts that they have pled sufficient facts to lead a reasonable jury to conclude that defendants' actions prior to the sexual assaults constitutes gross negligence, which led plaintiffs to be subjected to violent sexual assaults.

Plaintiffs' gross negligence claim also includes the conduct of the defendants subsequent to the sexual assaults on May 19, 2015. This includes: 1) defendants failed to perform a proper investigation into the incident; 2) defendants failed to correct, reprimand or discipline the assailants for these sexual assaults; 3) defendants failed to take any measures to protect plaintiffs, in the interim and after the school determined that a sexual assault had occurred; 4) defendants failed to make any effort to ensure plaintiffs were aware of available resources to help them cope with the aftermath of these assaults; 5) defendants did not follow their own policy regarding sexual assault and harassment; and 6) defendants ignored plaintiffs' complaints relating to the retaliation they experienced for reporting the sexual assaults. (see Plaintiffs' Complaint, ¶¶ 99-105, 119-23, 134-39, 211-228). Given the severe impact a sexual assault can have on the victims, especially younger individuals who have not fully matured and developed, plaintiffs assert that a reasonable jury could find that defendants conduct subsequent to the sexual assaults was such that there was a high probability that harm would follow. Plaintiff asserts that they have pled sufficient facts to lead a reasonable jury to conclude that defendants' actions subsequent to the sexual assaults constitutes gross negligence, which led plaintiffs to be subjected to psychological and emotional trauma, and denied them educational opportunities and benefits.

### E. Plaintiffs' Claim for Negligent Infliction of Emotional Distress (Count VI)

The District of Columbia has developed two different paths for proving a claim of negligent infliction of emotional distress (NIED). Plaintiffs may prove that the defendant's actions caused the plaintiff to be in danger of physical injury and as a result the plaintiff feared for his own safety. *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796, 2011 BL 175991, 5 (D.C. 2011); (citing *Williams v. Baker*, 572 A.2d 1062, 1066 (D.C. 1990) (en banc). The second path requires plaintiffs to prove that a defendant has assumed a duty to avoid inflicting emotional distress in certain circumstances where an underlying relationship or undertaking makes it not only foreseeable, but especially likely, that defendant's negligence will cause serious emotional distress to the plaintiff. *Hedgepeth*, 22 A.3d at 800. In this case, plaintiffs are relying solely on the zone of physical danger theory.

Defendants only argument regarding plaintiffs claim under the zone of danger theory is that the fear plaintiffs experienced was the result of the independent and allegedly unforeseen acts of the two assailants. The defendants' sole argument is based on a purely factual inquiry that should be left to a jury. Plaintiffs have plead, and defendants do not contest, that the acts and omissions of defendants placed plaintiffs in danger of physical injury (see Plaintiffs' Complaint, ¶¶61-64, 70-79, 80, 101-02, 106-19, 121-39, 233-35). Given that the plaintiffs have also plead that this zone of physical danger resulted in the plaintiffs' fear for their own safety, and this fear was due to the fact that no one was in the room supervising them (see Plaintiffs' Complaint, ¶¶44, 54, 68-69, 74, 231-32), the only determination to be made is whether this fear resulted from the acts and omissions of defendants, or the independent acts of the assailants, or both. Plaintiffs have plead the necessary elements for a NIED claim, and at this stage, taking the facts plead in plaintiffs'

Complaint as true, there is a sufficient claim for NIED against the defendants under a zone of physical danger theory.

## F. **Defendant's Claim That There is No Basis for Liability against Defendant Hense or Defendant Academy**

The Academy is a public charter school subject to the provisions of the D.C. Code governing public charter schools, D.C. Code §38-1802.04. In §38-1802.04(c)(5) the Code specifically states that:

> The Age Discrimination Act of 1975 ( 42 U.S.C. 6101 et seq.), title VI of the Civil Rights Act of 1964 ( 42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), § 504 of the Rehabilitation Act of 1973 ( 29 U.S.C. 794 ), part B of the Individuals with Disabilities Education Act ( 20 U.S.C. 1411 et seq.), and the Americans with Disabilities Act of 1990 ( 42 U.S.C. 12101 et seq.), shall apply to a public charter school.

Since the Academy is a public charter school, it is covered by Title IX, and therefore subject to liability for Title IX violations. In §38-1802.04(c)(17), the D.C. Code specifically states that "*A public charter school*, and *its incorporators*, Board of Trustees, *officers*, *employees*, and volunteers, shall be immune from civil liability, both personally and professionally, for any act or omission within the scope of their official duties unless the act or omission: (i) Constitutes gross negligence…" (emphasis added). The D.C. Code specifically speaks to civil liability for the public charter school itself, its incorporators, and its officers and employees. Defendant Hense is an officer of defendant Friendship, and the claims plaintiffs allege against him relate to acts or omissions that he, as the individual with final policymaking authority, would be held responsible for (See Plaintiffs' Complaint, ¶¶16, 20-22). The D.C. Code makes it clear that the school itself, not just its incorporators, have exposure to civil liability, and are subject to Title IX, and plaintiffs have plead sufficient facts to find that defendant Academy is a legal entity capable of being sued (Plaintiffs' Complaint, ¶19).

### G. **Defendant's Claim That Joinder of S.G. and J.G. is Improper**

Plaintiffs' claims will, without any doubt, involve the same questions of law and fact. The facts to both plaintiffs are nearly identical, the only difference being that they were each assaulted by different individuals. Should the court decide to sever these claims, it would be a waste of judicial resources, and a waste of resources on each side. The parties involved would be required to litigate these nearly identical claims separately, and would be unduly burdensome to both sides. It is both efficient and prudent to join these claims, and the defendants' have failed to assert any plausible reason for severing the claims, and cite no legal authority in support thereof.

### CONCLUSION

In light of the aforementioned reasons laid out in the memorandum of law, plaintiffs S.G. and J.G. respectfully request that this Court deny the defendants' motion to dismiss in its entirety.

Tanya Wells, on behalf Of her minor child, S.G.
Yolanda Thomas, on behalf Of her minor child, J.G.
By Counsel

Respectfully submitted,

/s/ *Billy L. Ponds*
Billy L. Ponds
The Ponds Law Firm
Bar Number 379883
2101 L Street, NW
Suite 400
Telephone Number: 202-333-2922
Email: plfpc@aol.com

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the **Plaintiffs' Opposition to the Defendants' Motion to Dismiss Plaintiffs' Complaint** was sent via Electronic Case Filing Management System to counsel for Defendant Hense et. al, Joseph F. Giordano, on this 25th day of July 2016.

/s/ Billy L. Ponds
Billy L. Ponds