UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TANYA WELLS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD L. HENSE, *et al.*, <br><br> Defendants. | Civil Action No. 1:16-cv-0901-ESH |

## MEMORANDUM OPINION

This case arises from an alleged incident of peer-on-peer sexual harassment/assault that occurred during the school day at the Friendship Collegiate Academy Public Charter School, a public charter school in the District of Columbia. The incident involved four high school students, two male perpetrators (D.B and E.E.) and two tenth-grade female victims (S.G. and J.G.). Plaintiffs Tanya Wells and Yolanda Thomas are the mothers of the minor victims and filed this suit on their behalf against the Charter School; its corporate owner, Friendship Public Charter School, Inc. (the "Corporation"); and the corporation's chief executive officer, Donald Hense, alleging violations of Title IX, 20 U.S.C. § 1681(a) (Counts I and II), 42 U.S.C. § 1983 (Counts III and IV), and District of Columbia tort law (Counts V and VI). Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants have moved to dismiss all of plaintiffs' claims. For the reasons stated herein, the motion will be granted as to Counts II, III, IV, part of V, and VI, and denied as to Count I and part of Count V.

**BACKGROUND**

I.  **FACTS ALLEGED IN THE COMPLAINT**

The facts as alleged in the complaint are as follows. At all relevant times, S.G. and J.G. were students in the 10th grade at Friendship Collegiate Academy Public Charter School, a public charter school in the District of Columbia authorized by and operating pursuant to D.C. Code § 38-1801, *et seq.* (Am. Compl. ¶¶ 9-10, 14-15, 19.) On May 19, 2015, S.G. and J.G. reported to their assigned classroom for math class. (Am. Compl. ¶ 30.) Their teacher, Gregory Harris, was absent due to a regularly-scheduled bi-weekly medical appointment, but no substitute teacher was present. (Am. Compl. ¶¶ 30-34.) There was no system in place to verify that an individual qualified to teach or monitor the students was present in each assigned classroom (Am. Compl. ¶ 62), and no other teacher or school official came to the classroom during the scheduled class period. (Am. Compl. ¶ 35.) In addition to the approximately ten other students who were supposed to be there, two male students, D.B. and E.E, who were supposed to be in a foreign language class in the next room, came into the unsupervised math classroom. (Am. Compl. ¶¶ 36-38.) S.G. and J.G. were in the back of the room. (Am. Compl. ¶ 41.) D.B. approached S.G. and grabbed her left arm above her wrist. (Am. Compl. ¶ 42.) S.G. told him to "move, stop and don't touch me," but he ignored her and then proceeded to forcefully hold her hair, maneuver her body to bend her over a table, stand behind her and, against her will, perform a grinding and thrusting sexual-type action. (Am. Compl. ¶¶ 44-48.) Five minutes later, he did it again. (Am. Compl. ¶¶ 49-50.) At the same time, E.E. engaged in similar conduct directed at J.G. (Am. Compl. ¶¶ 51-56.) None of the other students in the classroom intervened to stop D.B. or E.E. or notified any school official of what was happening. (Am. Compl. ¶¶ 59-60.) During the entire time these events were taking place, the doors to the math classroom were locked from the inside, and the windows were covered with sheets of paper. (Am. Compl. ¶ 40.)

In addition, there was no hall monitor or security guard in the hall in the vicinity of the math classroom. (Am. Compl. ¶ 62.)

D.B. and E.E.'s actions violated the Charter School's anti-harassment policy, which provides that harassment includes "references made to a person or group based upon age, sex, race, religion or ethnic origin. Verbal comments, sexual name-calling, gestures, jokes, slurs or spreading sexual rumors directed toward an individual or group is also considered harassment. Sexual harassment is unwelcome sexual advances, request for sexual favors, or other unwelcome verbal or physical contract of a sexual nature." (Am. Compl. ¶ 145.)

After the class period ended, J.G. told a friend about what had transpired, and during the next class period, both S.G. and J.G. were in the same chemistry class and several students in that class were talking about the incidents. (Am. Compl. ¶¶ 81-82.) However, neither S.G. nor J.G. reported the incidents to anyone that day. (Am. Compl. ¶ 83.) The following day, however, during a meeting with her "weekly mentoring group," S.G. mentioned that something had happened during math class. (Am. Compl. ¶¶ 84, 86.) At the request of the group's leader, Tiffany Green, S.G. remained after the meeting to talk to her in private, and she then told her what had happened. (Am. Compl. ¶¶ 87-89.) J.G. also told Ms. Green what had happened to her. (Am. Compl. ¶ 90.) Ultimately, Ms. Green reported the incidents to Ms. L. Jones, a Charter School official, who reported them to the Charter School's principal, Peggy Jones. (Am. Compl. ¶¶ 91.) A representative from the Charter School then contacted the girls' mothers and told them about the incidents. (Am. Compl. ¶ 92.)

Plaintiffs immediately went to the Charter School to meet with school officials. (Am. Compl. ¶ 93.) During that meeting, they learned that D.B. had been involved in a fight at school on May 18, 2015, and they were also told that the Charter School wanted to suspend D.B. and

3

E.E., that calls had been made to initiate their suspension, and that they would be arrested for their actions. (Am. Compl. ¶¶ 94-95.)

After that meeting, an investigation was conducted by the school officials and the MPD, but according to plaintiffs, they were not adequate. (Am. Compl. ¶¶ 99, 160-61.) In the end, neither D.B. nor E.E. was arrested, suspended or otherwise disciplined for the May 19, 2015 incidents. (Am. Compl. ¶¶ 96-97, 154.)

As a result of D.B. and E.E.'s continued presence at the Charter School, S.G. and J.G. were afraid to attend their classes. In addition, the incidents were the subject of extensive gossip and led to S.G. and J.G. being ostracized, called names and otherwise bullied by their peers. (Am. Compl. ¶¶ 108, 114-19.) S.G. and J.G. reported the peer harassment, but nothing was done to stop it. (Am. Compl. ¶¶ 120-21.) D.B. and E.E.'s continued presence at the school in conjunction with the peer harassment led S.G. and J.G. to stop attending classes for the remainder of the school year. (Am. Compl. ¶ 108.) They completed their remaining assignments at home, returning to the school only for a brief period to take their final exams. (Am. Compl. ¶¶ 108-09.) When S.G. and J.G. returned to school in the fall of 2015, D.G. and E.E.'s presence continued to cause them emotional stress. (Am. Compl. ¶ 169.)

Both S.G. and J.G. experienced significant drops in their grades for the fourth quarter of 2015. (Am. Compl. ¶¶ 111-12.) In addition, J.G. experienced nightmares as the result of E.E.'s actions toward her, and both have required ongoing mental health counseling. (Am. Compl. ¶¶ 115, 168, 172.)

## II. PROCEDURAL HISTORY

Plaintiffs filed the original complaint in this case on May 6, 2016, and an amended complaint on June 6, 2016. The amended complaint includes six Counts: Counts I and II are Title IX claims, brought against the Charter School and the Corporation (Am. Compl. ¶¶ 175-

4

89); Counts III and IV are § 1983 claims, brought against all of the defendants (Am. Compl. ¶¶ 190-208); Count V is a claim for gross negligence brought against all defendants (Am Compl. ¶¶ 209-229); and Count VI is a claim for negligent infliction of emotional distress brought against Hense and the Corporation (Am. Compl. ¶¶ 230-35.)  Plaintiffs seek injunctive relief "to ensure that the acts complained of herein are not engaged in again by the defendants or any of [their] agents" and damages.  (Am. Compl. at 33-34.)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants have moved to dismiss the complaint in its entirety for failure to state a claim upon which relief can be granted.  (Defs.' Mot. to Dismiss, ECF No. 7 ("Mot.").)  Plaintiffs have filed an opposition (Pls.' Opp'n, ECF No. 10 ("Opp'n")), and defendants filed a reply (Defs.' Reply, ECF No. 11 ("Reply").

## ANALYSIS

### I.  FED. R. CIV. P. 12(b)(6) LEGAL STANDARD

"In ruling on a motion to dismiss for failure to state a claim, the court must 'accept as true all of the factual allegations contained in the complaint,'" *Phillips v. Fulwood*, 616 F.3d 577, 581 (D.C. Cir. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), and "construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States,* 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).  However, the court will "not accept inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations."  *Id.* (citations omitted).

A court should dismiss a complaint for failure to state a claim if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Rudder v. Williams*, 666 F.3d 790, 7994 (D.C. Cir. 2012). To state a

facially plausible claim, a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint that pleads factual allegations that are "'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly,* 550 U.S. at 557). While the factual allegations need not be "detailed," the Federal Rules demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## II.     TITLE IX CLAIMS (COUNTS I & II)

Section 901(a) of Title IX prohibits sex discrimination by recipients of federal education funding. *See* 20 U.S.C. § 1681(a) ("[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance").[1] Although not expressly stated, sex discrimination for purposes of Title IX encompasses both sexual harassment and retaliation against a person because that person has complained of sexual harassment. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

"[Title IX's] only express enforcement mechanism, 20 U.S.C. § 1682, is an administrative procedure resulting in the withdrawal of federal funding from noncompliant institutions." *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009). However, the Supreme Court has held that Title IX implies a private right of action to enforce its prohibition on sex discrimination, *see Cannon v. Univ. of Chic.,* 441 U.S. 677, 708, 717 (1979), and that

---

[1] Title IX applies to District of Columbia public charter schools. *See* D.C. Code Ann. § 38-1802.04(c)(5).

private parties can seek monetary damages for intentional violations.[2] *See Franklin v. Gwinnett Cty. Public Sch.,* 503 U.S. 60, 76 (1992). This private right of action for damages encompasses claims based on a funding recipient's "deliberate indifference" to the sexual harassment of a student by another student, *Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 648 (1999), and for retaliation, *see Jackson*, 544 U.S. at 173-74 ("[r]etaliation is, by definition, an intentional act").

### A.   Discrimination Claim Based on Deliberate Indifference to Peer Sexual Harassment

Plaintiffs contend that the Charter School and the Corporation violated Title IX by showing deliberate indifference to D.B. and E.E.'s sexual harassment of S.G. and J.G. When a Title IX discrimination claim is based on peer sexual harassment, a funding recipient is liable in damages only if it is deliberately indifferent to peer sexual harassment of which it has "actual knowledge" and "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. "Deliberate indifference" in this context exists "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. Moreover, "the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645 (internal quotations omitted).

Defendants argue that the complaint fails to state a viable Title IX discrimination claim because there is no allegation that defendants had actual notice of any harassment prior to the

---

[2] Because Title IX was enacted as an exercise of Congress' powers under the Spending Clause, "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999).

May 19, 2015 incidents, the "resulting harassment" by other students after learning of the May 19, 2015 incidents did not rise to the level of actionable harassment under *Davis*, and defendants' response to the alleged harassment was not "clearly unreasonable."

Defendants are correct that the complaint does not allege actual notice of any harassment prior to the May 19, 2015 incident. However, no such allegation is necessary, for plaintiffs' claim concerns only defendants' actions *after* they were notified of the incident. (*See* Am. Compl. ¶¶ 176-85; Opp'n at 10 ("plaintiffs assert that defendants' acts and omissions *subsequent* to the sexual assault committed against plaintiffs on May 19, 2015, while they were in their assigned classroom, unsupervised, while school was in session, constitutes deliberate indifference to a hostile environment in violation of Title IX." (emphasis added).)

Defendants may also be correct that the alleged subsequent harassment by other students does not rise to the level of actionable harassment under *Davis*. Again, no such allegation is necessary as Title IX does not require that a defendants' deliberate indifference lead to subsequent actionable harassment. As the First Circuit has recognized, in *Davis* itself the Supreme Court "stated that funding recipients may run afoul of Title IX not merely by 'caus[ing]' students to undergo harassment but also by 'mak[ing] them liable or vulnerable' to it. *See Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172–73 (1st Cir. 2007), (quoting *Davis*, 526 U.S. at 645), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009).

Defendants' final contention is that the complaint fails to adequately allege deliberate indifference because defendants' alleged response to the May 19 incidents was not "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. The Supreme Court has recognized that it may be possible to determine on a motion to dismiss that a school's

8

response to a report of peer sexual harassment is "not 'clearly unreasonable' as a matter of law." *See id.* at 649. But arguably this is not that case.

To support their argument, defendants describe the material allegations in the complaint as establishing that, in response to the incident, school officials "considered suspending the offenders and having them arrested," "communicated remedial actions with both mothers," "conducted an investigation and involved the Metropolitan Police Department," "accommodated [the victims] and allowed [them] to complete their remaining class assignments for the year at home, which prevented further contact between [p]laintiffs and the offenders." (Mot. at 14 (citing Am. Compl. ¶¶ 92-93, 95, 99, 109).[3]) The problem for defendants is that their "recitation of the allegations fails to accept all of the factual allegations of the complaint as true and to draw all plausible inferences in plaintiffs' favor. Rather, it ignores some allegations altogether, such as the allegation that defendants "failed to take any action to correct, reprimand or discipline" either D.B. or E.E. (Am. Compl. ¶¶ 97-98.) Other allegations are restated in an arguably misleading manner. For example, the complaint alleges that defendants "did not take immediate and appropriate steps to investigate or determine what occurred" and that "their own investigation, and the MPD investigation, was incomplete" (Am. Compl. ¶ 99), but is recast as defendants "conducted an investigation and involved the [MPD]." (Mot. at 14.) Similarly, the allegation that plaintiffs were "informed . . . that [the Charter School] *wanted* to suspend D.B. and E.E." and that they "would be arrested" (Am. Compl. ¶ 95) is presented by defendants as an

---

[3] In their reply, defendants describe the complaint as alleging "that the May 19, 2015 assaults were investigated by the Defendants in conjunction with the police, that the victims' parents were consulted, that various disciplinary measures were considered against the assailants, that Plaintiffs' educational needs were considered and accommodated, and that disciplinary measures were considered concerning alleged harassment by other students." (Reply at 3.)

9

allegation that remedial actions were "communicated." (Mot. at 14.) Finally, defendants' version of the allegations inappropriately draws inferences in its own favor. For example, they construe the allegation that S.G. and J.G. "completed their remaining class assignments for the year from home and did not participate in their exam review sessions because D.B. and E.E. were at [the Charter School] and due to student harassment" (Am. Compl. ¶ 109), to mean that defendants "accommodated and allowed" the victims to work from home. (Mot. at 14.)

If one were to accept all of the factual allegations in the complaint as true and draw all plausible inferences in plaintiffs' favor, as we must do at this stage, defendants' response to the reported incidents was to promise an investigation and appropriate consequences, but then to fail to conduct a proper investigation, to punish the perpetrators, to ensure that the victims were protected from future assaults, and to prevent the subsequent harassment by other students, all of which caused the victims to stop attending school for the remainder of the year. (*See* Am. Compl. ¶¶ 91-104, 119-21.) Since it is this version that matters, the Court cannot conclude that defendants' response to the incident was "not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649; *cf. Doe v. Forest Hills Sch. Dist.*, No. 1:13-cv-428, 2015 WL 9906260, at *9 (W.D. Mich. Mar. 31, 2015) (concluding in a peer harassment case that "[m]erely investigating and doing nothing more is not a reasonable response" (citing *Vance v. Spencer Cty. Pub. Sch.*, 231 F.3d 253, 260 (6th Cir. 2000))); *see also Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 369 (W.D. Pa. 2008) ("The reasonable response doctrine implies a duty on the part of the funding recipient, upon notice of possible sexual harassment, to promptly investigate and if necessary to take remedial action.").

Accordingly, the Court concludes that plaintiffs have adequately stated a claim that defendant's response to the sexual harassment incident on May 19 violated Title IX.

B.     **Retaliation**

Plaintiffs claim that school officials unlawfully retaliated against S.G. and J.G. for reporting the May 19, 2015 incidents by (1) failing to properly investigate and otherwise ignoring their mandated Title IX responsibilities, and (2) declining to intervene to stop the harassment and bullying by other students. (Am. Compl. ¶¶ 186-89.)

As in the context of Title VII, courts have generally held a "plaintiff who lacks direct evidence of retaliation must first make out a *prima facie* case of retaliation by showing (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014); *see also Papelino v. Albany Coll. of Pharmacy*, 633 F.3d 81, 91 (2d Cir. 2011) ("a plaintiff claiming retaliation under Title IX must first establish a *prima facie* case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action").

There are a number of potential problems with plaintiffs' retaliation claim,[4] but the most glaring is their failure to adequately allege a causal connection -- that "a retaliatory motive played a substantial part in prompting the adverse action." *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002). There is simply no factual allegation in the complaint which suggests a causal connection between the act of reporting the sexual harassment and the

---

[4] One question is whether it is even possible for deliberately harmful inaction in response to a report of sexual harassment is equal to an adverse action for purposes of retaliation. At least one court has expressly rejected that proposition. *See Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1361 (M.D. Ga. 2007) ("the Court does not believe the Supreme Court, when it announced its holding in *Jackson*, intended the same set of facts to give rise to both a discrimination and a retaliation claim").

11

school's alleged failure to respond appropriately. Accordingly, plaintiffs' retaliation claim will be dismissed.

### III.     SECTION 1983 CLAIMS (COUNTS III & IV)

Plaintiffs also claim that defendants' actions or inaction renders them liable under § 1983[5] for depriving the victims of their Fifth Amendment right to equal protection under the law.[6]

Section 1983 provides for a cause of action against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must plead facts sufficient to establish (1) "the violation of a right secured by the Constitution and the laws of the United States" and (2) "that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). There is no *respondeat superior* or vicarious liability under § 1983. *Burnett v. Sharma*, 511 F. Supp. 2d 136, 141 (D.D.C. 2007). Accordingly, where the defendant is a municipality or artificial entity, a plaintiff must also plead that "a custom or policy . . . caused the violation." *Baker v. District of Columbia,* 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978)); *Blue*

---

[5] The Supreme Court has held that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights." *Fitzgerald*, 555 U.S. at 258.

[6] The District of Columbia "is a political entity created by the federal government, [so] it is subject to the restrictions of the Fifth Amendment, not the Fourteenth." *Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir.1991). The Fifth Amendment, though, imposes the same equal protection requirements on the District as the Fourteenth Amendment imposes on the states. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

*v. District of Columbia,* 811 F.3d 14, 18 (D.C. Cir. 2015), *cert. denied,* 137 S. Ct. 77 (2016); *City of Canton v. Harris,* 489 U.S. 378, 388–389 (1989) ("a municipality can be liable under § 1983 only where its policies [or customs] are the 'moving force [behind] the constitutional violation.'") (quoting *Monell,* 436 U.S. at 694)); *see Maniaci v. Georgetown Univ.,* 510 F. Supp. 2d 50, 62 (D.D.C. 2007) (collecting cases and explaining the applicability of *Monell* to claims against "private institutions" that "employ quasi-state actors").[7]

Defendants present several arguments for dismissing the § 1983 claims. First, as to all defendants, they argue that they did not act "under color of state law." Second, as to the Charter School and the Corporation, they argue that the complaint fails to adequately allege that the predicate constitutional violations were caused by a policy or custom. Finally, they argue that the claims against Hense in his individual capacity must be dismissed because the complaint does not allege that he personally took any unconstitutional action.[8] The Court agrees with defendants as to the second and third arguments, so it need not address the first.[9]

---

[7] *See also, e.g., Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972, 975–76 (8th Cir. 1993) ("[A] corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies. The proper test is whether there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983." (internal citations omitted)); *Rojas v. Alexander's Dep't Store, Inc.,* 924 F.2d 406, 409 (2nd Cir. 1990) ("Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses."); *Iskander v. Forest Park,* 690 F.2d 126, 128 (7th Cir. 1982) ("[J]ust as a municipal corporation is not vicariously liable upon a theory of *respondeat superior* for the constitutional torts of its employees, a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights."); *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 505–06 (4th Cir. 1982) (private employer of security guard cannot be held liable under § 1983 on principle of *respondeat superior*).

[8] In their motion, defendants also argue that the complaint failed to state a claim for a substantive due process violation (Mot. at 22-23), but plaintiffs indicate in their opposition that they are only proceeding on an equal protection theory (Opp'n at 24). Defendants do not argue that the complaint fails to state a claim for an equal protection violation.

[9] One circumstance under which a private party may be considered a state actor for purpose of § 1983 is when it "has been delegated a public function by the State." *Brentwood Acad. v.*

13

### A. Policy or Custom

Defendants next argue that the § 1983 claims against the Charter School and the Corporation should be dismissed because the complaint fails to adequately allege a custom or policy of defendants that caused any constitutional violation.

A plaintiff may allege a municipal policy or custom by pointing to (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker,* 326 F.3d at 1306 (internal citations omitted); *Blue*, 811 F.3d at 18–19.

Plaintiffs allege that defendants had a custom or policy of "not adequately responding to sexual assaults and harassment" and of "failing to adequately train and supervise their personnel in responding to and preventing sexual assaults and harassment." (Opp'n at 24; *see also* Am. Compl. ¶¶ 193, 206.)

Defendants argue that the factual allegations in the complaint are insufficient to support either theory. The Court agrees. Generally, a plaintiff "sufficiently pleads a § 1983 [custom or

---

*Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). In this case, the Charter School is a "public charter school," authorized by and operating pursuant to District of Columbia law, *see* § 38-1802.01, *et seq.*, and plaintiffs thus argue that its actions, at least in this context, are properly viewed as actions taken under color of state law. (*See* Opp'n at 22-23; Am. Compl. ¶¶ 19, 200.) The question of whether the actions of employees of a public charter school in the District of Columbia are acting under color of state law in responding to a claim of peer harassment raises an issue not yet addressed by any court in this Circuit, and it need not be resolved here.

policy] claim when his complaint refers to specific incidents that plausibly show a custom or pattern of behavior." *Patrick v. District of Columbia*, 179 F. Supp. 3d 82, 87 (D.D.C. 2016). For example, in *Warren v. District of Columbia*, 353 F.3d 36, 40 (D.C. Cir. 2004), the allegation that prison officials "stuck the same needles in everybody's arms to draw blood" was sufficient to allege a custom or policy of deliberate indifference to prisoner mistreatment. *See also Singh v. District of Columbia*, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (allegations that plaintiff had three traffic tickets over the span of eighteen days and reported the harassment on five separate occasions adequately alleged custom or policy of deliberate indifference to harassment). Unlike those cases, here the factual allegations describe only a single instance of allegedly unconstitutional conduct -- the May 19 incident and its aftermath. That fact does not necessarily doom plaintiffs' claim. *See Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 123–24 (D.D.C. 2012) ("our Circuit has held that a plaintiff need not identify multiple instances of unconstitutional conduct in order to prove an unconstitutional municipal policy" (citing *Atchinson v. District of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996))). But absent a pattern of constitutional violations, a complaint "'must include some factual basis for the allegation of a municipal policy or custom.'" [10] *Id.* (quoting *Atchinson*, 73 F.3d at 423); *see also Blue*, 811 F.3d at 20; *see also Trimble v. District of Columbia*, 779 F. Supp. 2d 54, 59 (D.D.C. 2011) ("[M]erely speculating that an unidentified policy and uncorroborated practice or custom exists without providing any factual heft to support the allegation is insufficient to state a claim under §

---

[10] This case does not present the "unusual situation in which misconduct is 'sufficiently serious and obvious' that the misconduct, 'on its face, raises doubts about a municipality's training policies.'" *Grissom*, 853 F. Supp. 2d at 123 (quoting *Atchinson*, 73 F.3d at 422–23).

15

1983."):. The factual allegations in this complaint, similar to the allegations in many other cases,[11] are inadequate.[12]

### B. Individual Capacity Claims Against Hense

Defendants correctly argue that the individual capacity claims against Hense must be dismissed because the complaint is devoid of any allegation that he personally took any action relating to the underlying incidents. The Court agrees. The complaint does not contain any facts suggesting that Hense played any personal role in the allegedly unconstitutional acts, and § 1983 does not impose liability absent individual involvement in the allegedly illegal conduct. *See Jones v. Horne,* 634 F.3d 588, 602 (D.C. Cir. 2011); *Jordan v. District of Columbia*, 949 F. Supp. 2d 83, 86–87 (D.D.C. 2013). Accordingly the complaint does not state a § 1983 claim against Hense in his individual capacity.

## IV. STATE LAW TORT CLAIMS (COUNTS V & VI)

The two remaining claims, Counts V and VI, are tort claims brought under District of Columbia law: one for gross negligence and the other for negligent infliction of emotional

---

[11] *See, e.g.*, *Jackson v. District of Columbia,* No. 15-cv-145, 2016 WL 1254217, at *4 (D.D.C. Mar. 29, 2016); *Young v. District of Columbia*, 107 F. Supp. 3d 69, 80–81 (D.D.C. 2015); *Bradley v. District of Columbia Pub. Sch.*, 87 F. Supp. 3d 156, 160–61 (D.D.C. 2015); *Bell v. District of Columbia*, 82 F. Supp. 3d 151, 155–56 (D.D.C. 2015); *Sheikh v. District of Columbia*, 77 F. Supp. 3d 73, 85 (D.D.C. 2015); *Runnymede–Piper v. District of Columbia,* 952 F. Supp. 2d 52, 58 (D.D.C. 2013); *Philogene v. District of Columbia*, 864 F. Supp. 2d 127, 131 (D.D.C. 2012); *Grissom*, 853 F. Supp. 2d at 123–24; *Costello v. District of Columbia*, 826 F.Supp.2d 221, 225–26 (D.D.C. 2011); *Paul v. District of Columbia*, 815 F. Supp. 2d 193, 197-98 (D.D.C. 2011); *Harris v. District of Columbia*, 696 F. Supp. 2d 123, 129 (D.D.C. 2010); *Smith v. District of Columbia*, 674 F. Supp. 2d 209, 212 (D.D.C. 2009).

[12] *See, e.g.*, Am. Compl. ¶ 196 ("On information and belief, defendants have followed these unconstitutional customs and policies . . . with regard to criminal and tortious misconduct committed against other Academy students; Am. Compl. ¶ 182 ("Defendants . . . engaged in a pattern and practice of behavior designed to discourage and dissuade students and parents of students who had been sexually assaulted from seeking prosecution and protection and from seeking to have sexual assaults . . . fully investigated.").

distress.  Having concluded that plaintiffs' Title IX claim may proceed, the Court has no basis for declining to exercise jurisdiction over these related state law claims; however, defendants have also presented substantive arguments for dismissal.

### A. Gross Negligence

To state a claim for negligence in the District of Columbia, a plaintiff must allege: "(1) the existence of a duty owed by the defendant to the plaintiff, (2) a negligent breach of that duty by the defendant, and (3) an injury to the plaintiff (4) proximately caused by the defendant's breach." *Powell v. District of Columbia*, 602 A.2d 1123, 1133 (D.C. 1992).  Although "[t]he [common] law of the District of Columbia does not recognize degrees of negligence," *Warner v. Capital Transit Co.,* 162 F. Supp. 253, 256 (D.D.C. 1958), where there is a statute that precludes liability for ordinary negligence,[13] courts have defined gross negligence as "such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." *District of Columbia v. Walker,* 689 A.2d 40, 44 (D.C. 1997).  "Where . . . there is no evidence of subjective bad faith on the part of the actor, the extreme nature of the conduct may be shown by demonstrating that the actor acted in disregard of a risk 'so obvious that [the actor] must be taken to be aware of it and so great as to make it highly probable that harm would follow.'" *Id*. at 44–45 (quoting 3 S. Speiser, *et al.,* The American Law of Torts, § 10.2, at 361 (1986)).

---

[13] Under District of Columbia law, these defendants are immune from civil liability for ordinary negligence.  *See* D.C. Code Ann. § 38-1802.04(17)(A) ("a public charter school, and its incorporators, Board of Trustees, officers, employees, and volunteers, shall be immune from civil liability, both personally and professionally, for any act or omission within the scope of their official duties unless the act or omission: (i) Constitutes gross negligence; (ii) Constitutes an intentional tort; or (iii) Is criminal in nature.")

17

Plaintiffs' gross negligence claim covers defendants' conduct leading up to and after the May 19 incident. Defendants argue that plaintiffs' gross negligence claim should be dismissed because the complaint fails to adequately allege "an extreme deviation from the ordinary standard of care." (Mot. at 26.) As to defendants' actions before the May 19 incidents, the Court agrees. The relevant allegations in the complaint boil down to (1) D.B. had been involved in a fight the previous day; and (2) the school failed to ensure that the victims' math class, which was next door to the D.B.'s class, was not left unsupervised for an entire class period. Since there is no allegation of prior notice, it is not possible to conclude that defendants disregarded an "obvious" and "highly probable" risk that the May 19 incident would follow. As to defendants' actions after the May 19 incident was reported, plaintiffs allege that defendants essentially did nothing after learning about the incident, either to punish the perpetrators or to protect the victims. Taking these allegations as true, and drawing all inferences in plaintiffs' favor, the Court cannot say, as a matter of law, that defendants' actions were not an extreme deviation from the ordinary standard of care. Accordingly, plaintiffs' gross negligence claim will not be dismissed, but it will be limited to defendants' actions after the incident was reported.

### B.  Negligent Infliction of Emotional Distress

To state a claim for negligent infliction of emotional distress, plaintiffs must allege that "(1) the plaintiff was in the zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for his own safety, and (4) the emotional distress so caused was serious and verifiable." *Cornish v. District of Columbia*, 67 F. Supp. 3d 345, 363 (D.D.C. 2014).[14] "'Serious and verifiable' means that the distress must have manifested in an external

---

[14] Plaintiffs are not proceeding under the alternative "special relationship" theory that was recently recognized by the District of Columbia Court of Appeals. *See Hedgepeth v. Whitman*

18

condition or physical symptoms." *Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011) (quoting *Jones v. Howard Univ., Inc.,* 589 A.2d 419, 424 (D.C. 1991)).  Plaintiffs claim that defendants' actions *prior* to the May 19 incident created such a "zone of physical danger" in the victims' math classroom, causing the victims to fear for their safety and suffer serious and verifiable emotional distress.  (*See* Am. Compl. ¶¶ 230-35.)  Given defendants' statutory immunity from claims of ordinary negligence (*see supra* note 13), defendants' actions that allegedly created the "zone of danger" must rise to the level of *gross* negligence.  Yet, as the Court has already explained, defendants' alleged actions leading up to the May 19 incident did not amount to gross negligence.  Accordingly, plaintiffs' claim for negligent infliction of emotional distress will be dismissed.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is granted as the Title IX retaliation claim (Count II), the § 1983 claims (Counts III and IV), the negligent infliction of emotional distress claim (Count VI); granted in part and denied in part as to the gross negligence claim (Count V), and denied as to the Title IX discrimination claim (Count I).  A separate Order accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 24, 2017

---

*Walker Clinic*, 22 A.3d 789, 810–11 (D.C. 2011).