# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SHELBY GREENE,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 16-00901 (ESH)** |
| **FRIENDSHIP PUBLIC CHARTER SCHOOL, INC.,** ***et al.*****,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Defendants have filed a motion for summary judgment. For the reasons set forth below, the Court grants the motion with respect to Count I of the Fourth Amended Complaint, which alleges that defendants violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"). The Court dismisses the remaining state law claims, Counts II and III, without prejudice to plaintiff's refiling in D.C. Superior Court.

## BACKGROUND

### I.      FACTUAL BACKGROUND

During the 2014–2015 school year, plaintiff Shelby Greene ("plaintiff" or "Greene") was a tenth-grade female student attending defendant Friendship Collegiate Academy Public Charter School ("Academy"), which is owned and operated by defendant Friendship Public Charter School, Inc. ("Friendship") (collectively "defendants"). (Fourth Am. Compl. ¶¶ 5, 6, 12, ECF

No. 106.)  D.B. was a tenth-grade male student who also attended the Academy during the 2014–2015 school year.  (*See* D.B. Discipline Packet Checklist, ECF No. 101-4.)[1]

Greene and D.B. became acquainted during their sophomore year.  (Greene Dep. 41:5–18, ECF Nos. 99-6, 100-3.)  They would say an occasional "hi" to each other.  (*Id.* 39:10–12.)  A couple times during the school year, D.B. made sexually suggestive comments to Greene, commenting on her butt and indicating that he wanted to have sex with her.  (*Id.* 40:18–21; 41:2–4; 79:12–25; Greene Incident Report Form, ECF No. 100-4; Pl.'s Statement of Facts ("SOF") ¶ 16, ECF No. 100-1.)  Greene rebuffed D.B.'s verbal advances but did not report D.B.'s comments to any adult at the Academy.  (Greene Dep. 42:3–5, 79:12–21.)  There is no evidence that the school was aware of D.B.'s inappropriate comments to Greene.

### a. D.B.'s Disciplinary History Prior to May 12, 2015

D.B. had repeated disciplinary infractions as a student at the Academy, which included using disrespectful language and violent incidents with other students and school officials.  (D.B. PowerSchool Log at 1–4, ECF No. 99-10.)  None of D.B.'s reported disciplinary incidents prior to May 2015 involved Greene.  (*Id.*)[2]

Many of D.B.'s disciplinary incidents involved females at the school, and Greene encourages the Court to interpret some of them as sexual in nature.  For instance, on December 2, 2013, D.B. called a female teacher a "bitch."  (*Id.* at 4.)  The school responded by calling

---

[1] This Memorandum Opinion refers to D.B. and other students at the Academy by their initials because they were minors at the time of the relevant events alleged.  While the plaintiff, Shelby Greene, was a minor at the time as well, the Court uses her name in this opinion given that Greene, since reaching the age of majority, has sought to identify herself by her full name in public filings with the Court.  (*See, e.g.*, Mot. for Substitution of Pl., ECF No. 89.)

[2] The Court's description of D.B.'s disciplinary history will include those incidents that are identified in Greene's Statement of Facts and that could be of relevance to Greene's claims.  (*See* Pl.'s SOF ¶¶ 6–12.)  D.B.'s disciplinary log also contains additional entries in which D.B. was also written up for infractions such a cursing or using his cell phone in class.  (D.B. PowerSchool Log at 1–4.)

D.B.'s mother. (*Id.*) On December 17, 2013, D.B. chased after a female student, hitting her with a belt. (*Id.* at 3–4.) Greene asks the Court to characterize this belt-beating as a "sexual assault[]." (Pl.'s SOF ¶ 6.) D.B. was recommended for a nine-day suspension for this incident, although his attendance records indicate he may have only served a four-day suspension. (*Id.* at ¶ 7; D.B. PowerSchool Log at 3–4; D.B. Attendance Record 2013–14, ECF No. 100-23.)

On February 3, 2014, D.B. was horsing around with another student while a female teacher stood nearby. (D.B. PowerSchool Log at 3.) The other student attempted to hit D.B., but D.B. ducked and pushed the other student's hand, causing the female teacher to be hit in the face. (*Id.*) D.B. received a six-day out-of-school suspension for this incident. (*Id.*)

On November 17, 2014, D.B. told a security officer to get out of the classroom because his "dick is little." (*Id.* at 2.) In this November 17 entry in the school's PowerSchool computer system,[3] D.B.'s teacher, Gregory Harris, further noted: "I have also noticed [D.B.] touching the young ladies in the class inappropriately. The young ladies did not mention it[,] so I choose not to bring any more attention to it in hopes not to embarrass the young lady." (*Id.*)

On February 10, 2015, D.B. "playfully jab[bed]" a female student in the arm, and then began shoving her repeatedly in the chest when she told him she did not like his jabbing. (*Id.* at 1.) Greene urges the Court to interpret this incident as a "sexual assault[]" of a female student. (Pl.'s SOF ¶ 11.) D.B. served a three-day suspension for this incident. (D.B. PowerSchool Log at 1.)

---

[3] PowerSchool was a software program that defendants used to maintain student information, including contact information and disciplinary incidents. (Waller Dep. (Part I) 171:17–172:14, ECF No. 100-26.) The Academy's principal and Academy Director had access to all Academy students' information in the software program. (*Id.* 172:15–174:11.) Teachers were able to make and see entries for students who were in their classes. (*Id.*)

D.B.'s disciplinary infractions also included violent behavior towards male students. Of particular relevance, on May 11, 2015, D.B. walked up to a male student and hit him. (*Id.*) Academy Director Kathryn Procope, whose role was akin to that of a vice principal, entered into the PowerSchool system that D.B. should receive a nine-day suspension with a recommendation for expulsion as a result of this incident. (*Id.*; *see also* Waller Dep. (Part I) 174:1–2; Waller Dep. (Part II) 456:20–457:17, ECF No. 100-9.) However, in order to effectuate a suspension that is recommended in the PowerSchool log, Friendship requires that a school official prepare a "notice of suspension." (Waller Dep. (Part II) 430:8–18.) It appears that Procope did not prepare a notice of suspension before the next day, May 12, and thus D.B. attended school that day. (*See id.*)

### b. The Incident on May 12, 2015

Greene alleges that the first and only instance in which D.B. behaved inappropriately towards her—that was reported to a school official—occurred on Tuesday, May 12, 2015. On that day, Greene attended her regularly scheduled geometry class. (Greene Dep. 15:14–16.) Her teacher, Gregory Harris, was absent from the classroom, and the students were left unsupervised during the entire class period, which was more than an hour long. (*Id.* 15:17–18, 20:21–21:1.) Gregory Harris appears to have been absent due to a regularly scheduled medical appointment, which had also caused him to have been absent in prior weeks. (*See* Defs.' Memo. in Supp. of Mot. for Summ. J. ("Defs.' Mot.") at 2, ECF No. 99-1; Harris Attendance Record, ECF No. 100-27 (indicating Harris' absences during the three Tuesdays prior to May 12, 2015).)

According to the Academy's principal, Peggy Jones, Harris "did not inform anyone that he was leaving for the day" on May 12, 2015. (Peggy Jones Dep. 217:17–18, ECF Nos. 99-5, 100-21.) There was a security guard and a dean of students on the floor of the geometry

classroom, whose "responsibility was to . . . check every classroom" to ensure a teacher was present. (*Id.* 217:2–5.) However, on May 12, 2015, the security guard and dean of students failed to fulfill their responsibility of checking the classrooms. (*See* Peggy Jones May 14, 2015 Email, ECF No. 100-22; *see also* Peggy Jones Dep. 183:22–184:2 (Principal Peggy Jones describing the dean of students as "100 percent irresponsible" because he was near the classroom but "never checked" inside).) An email sent by Peggy Jones on May 14, 2015, also indicated that the Academy had a "shortage in security guards" at the time. (Peggy Jones May 14, 2015 Email.) No details have been provided regarding how many security guards the school was allegedly lacking, as Jones has stated she has no recollection of this shortage beyond what her email states. (Peggy Jones Dep. 243:12–15.)

During the unsupervised class period, Greene sat with her friend chatting. (Greene Dep. 18:9–25.) D.B. was not a student assigned to Greene's geometry class, but he wandered into the geometry classroom while it was unattended. (Peggy Jones May 14, 2015 Email.) According to Greene, D.B. pulled her out of her chair, bent her over on the table, and "dry humped" her "from behind" while "holding [her] hair" as she "tri[ed] to get away." (Greene Dep. 19:2–8.) The fact that D.B. "dry humped" Greene twice near the back of the classroom is undisputed, although the extent of her protest is. (Defs.' SOF ¶¶ 2–3 & Pl.'s Resp., ECF No. 100-1.) A video depicting part of this incident was taken by another student, M.G., and posted to the messaging application Snapchat. (J.G. Witness Statement, ECF No. 100-11; Greene Dep. 24:8–22.) The ten-second video depicts a fully-clothed male rubbing his crotch against the butt of a fully-clothed female who is bent over a table. (Snapchat Video, ECF No. 100-17.) The male then slaps the female's butt repeatedly before walking away. (*Id.*) One is unable to see the female's face, so it is not possible to assess the female's reaction to D.B.'s conduct.

At the same time as the alleged assault of Greene, another student, E.E., allegedly committed a similar assault against Greene's friend, J.G. (Greene Witness Statement, ECF No. 100-10.) Greene witnessed E.E. grab J.G., turn her around, and "dry hump[]" J.G. while they were fully clothed. (*Id.*) Greene has not alleged that E.E. harmed or bothered her personally in any way—either before, during, or after May 12, 2015. (Greene Dep. 40:2–14 (Greene explaining that before the incident E.E. never harassed her); Greene Witness Statement (Greene describing E.E. as having "dry humped" her friend, not herself); Greene Dep. 46:3–10 (Greene explaining that after the incident, she had no contact with E.E.).)[4]

### c. Reporting of the Incident

Greene reported the incident with D.B. to the Academy the following day. Greene attended "SNEAKERS," a discussion group for girls, on May 13, 2015, after which she told the facilitator, Tiffany Greene, about the incident involving D.B. the day before. (Greene Dep.

---

[4] In the initial complaint, there was an additional plaintiff, Yolanda Thomas, who brought claims on behalf of her minor child, J.G., related to the alleged assault by E.E. (Compl. ¶¶ 51–57, 175–233, ECF No. 1.) The parties later stipulated that all claims by Thomas and J.G. would be dismissed with prejudice. (Stipulation ¶ 1, ECF No. 59; *see also* Jan. 24, 2018 Minute Order (granting Thomas's voluntary dismissal motion subject to the stipulation).) The stipulation further provided that if Thomas and J.G. did not appear for depositions, the parties would be prohibited from introducing at trial reference to their claims. (Stipulation ¶¶ 4–5.) Defendants assert that they were unable to locate Thomas and J.G. in order to depose them. (Defs.' Mot. to Strike at 2–3, ECF No. 107.) Defendants, relying on the stipulation, have moved to strike the portions of the Fourth Amended Complaint that mention J.G. and Thomas, but notably have not moved to strike any portion of the summary judgment briefing. (*See id.* at 1–4.) Greene opposes defendants' motion, arguing that what happened to J.G. and the school's response is relevant to Greene's claims and such evidence is not foreclosed by the stipulation. (Pls.' Opp. to Mot. to Strike at 3–4, ECF No. 108.) The Court's ruling on the motion for summary judgment, described *infra*, moots the issue of whether portions of the Fourth Amended Complaint should be struck, and thus the Court DENIES defendants' motion to strike portions of the Fourth Amended Complaint (ECF No. 107) as moot. The Court does not omit mention of the assault involving J.G. in this opinion, as defendants have not moved to strike the summary judgment record regarding this incident, and consideration of evidence related to what happened to J.G. does not change the conclusion that summary judgment should be granted to defendants on Greene's Title IX claim and the rest of Greene's claims be dismissed without prejudice.

26:11–27:17; Defs.' SOF ¶ 5 & Pl.'s Resp.)  Tiffany Greene said that she had to report it to a school official.  (Greene Dep. 27:14–17.)  Shelby Greene went with Tiffany Greene to report the incident to Lynne Jones.  (*Id.* 29:17–23.)  Lynne Jones was the Academy's Student Staff Support Team (SSST) coordinator.  (Peggy Jones Dep. 144:6–11.)  The Academy's principal, Peggy Jones, was then contacted, as was Shelby Greene's mother.  (Greene Dep. 32:3–14.)

On the evening of May 13, 2015, a meeting was held with Peggy Jones, Lynne Jones, Shelby Greene, Shelby Greene's mother (Tanya Wells), and Officer Singleton (a police officer assigned to the Academy).  (Defs.' SOF ¶ 12 & Pl.'s Resp.)  J.G. and her mother, Yolanda Thomas, joined the meeting, with J.G. reporting that she had been violated as well.  (Lynne Jones May 26, 2015 Email, ECF No. 100-28.)  At this meeting, Peggy Jones indicated that she intended to suspend D.B. and E.E.  (Greene Dep. 37:23.)  Greene's mother, Wells, said that her daughter would not be returning to classes at the Academy for the remainder of the school year (approximately three weeks).  (*Id.* 42:25–43:1, 64:7–10.)  Wells made this decision without consulting Greene, but Greene independently felt that she did not want to come back to the Academy for the remainder of her sophomore year.  (*Id.* 45:17–46:2.)

After the meeting at the Academy, Greene and her mother went directly to the police station, along with J.G. and her mom, to report what happened to the Youth and Family Services Division.  (*Id.* 48:4–11.)  Detective Sarah Hoffman spoke to Greene and J.G. about the incident that had occurred the day before.  (Hoffman Dep. 15:22–16:15, ECF No. 99-8.)  Hoffman would later go to the school to gather further information regarding the incident before closing the case.

(*Id.* 17:23–18:3, 30:16–22.) Hoffman described the school as "very helpful" in facilitating the police investigation. (*Id.* 18:8–14.)[5]

### d. The School's Investigation

In addition to the police investigation, the school conducted its own investigation of the May 12 incident. Academy Director Kathryn Procope led this investigation, with direction from principal Peggy Jones and involvement from Lynne Jones. (Peggy Jones Dep. 156:6–18, 158:3–5; Lynne Jones Dep. 74:2–18, ECF No. 100-8.) James Waller, Friendship's 30(b)(6) designee, has described another person, Tamika Maultsby, as having been designated responsibility for defendants' Title IX investigations during the 2014–2015 school year. (Waller Dep. (Part II) 208:5–22.) However, Maultsby was not involved in the investigation into the May 12 incident, was not communicated with about the investigation, and was not informed of the results of the investigation prior to its conclusion. (Maultsby Dep. 84:4–85:9, ECF No. 100-6; Peggy Jones Dep. 142:1–5.)[6]

The school's investigation consisted of interviewing and collecting written statements from students who were present during the May 12 incident, as well as gathering available video footage. (*See* Greene, J.G., E.E., M.G., & D.S. Witness Statements, ECF Nos. 100-10, 100-11,

---

[5] Detective Hoffman prepared several reports over the course of her investigation. (Police Reports, ECF No. 99-9.) Hoffman ultimately closed the case in regard to both D.B. and E.E., concluding that it was "unfounded for sexual abuse." (Hoffman Dep. 30:19–22; *see also* Police Reports at 11.) Hoffman reached this conclusion after interviewing other witnesses and after Greene allegedly told her that "everyone was playing around and having fun" and "it was all fun and games until people at school start[ed] talking about her." (Police Reports at 9–11.) Greene has filed an affidavit saying that she never made this statement to Hoffman. (Greene Aff. ¶ 5, ECF No. 100-19.)

[6] At her deposition, Maultsby denied that her "title" was "Title IX coordinator," and she stated that she was not aware of anyone else having that title for Friendship or the Academy during the 2014–2015 school year. (Maultsby Dep. 21:14–22:18.) However, Maultsby stated that she was in charge of Title IX compliance for the Friendship school system at that time and that the Academy was supposed to report any sexual assaults to her. (*Id.* 85:10–14, 87:19–22.)

100-12, 100-14, 100-15 (collectively "Witness Statements"); Peggy Jones May 26, 2015 Email, ECF No. 99-7.) Lynne Jones recalls that the school determined whom to interview by asking Greene and J.G. who were in the room, as well as pulling the classroom roster. (Lynne Jones Dep. 74:2–8.) The number of students in the classroom at the time of the incident was somewhere between ten and twenty-five. (J.G. Witness Statement (J.G. explaining that "there were about 10 people in there"); Lynne Jones Dep. 76:3–7 (describing the classroom roster as containing twenty to twenty-five students).)

Five written statements were collected by the school from Greene, J.G., E.E., M.G., and D.S., all of which are dated between May 13 and May 15, 2015. (*See* Witness Statements.) When Detective Hoffman came to the school on May 15 to investigate, defendants provided her with the written statements they had collected from the students. (Hoffman Dep. 18:8–14, 21:5–10, 22:11–20.) E.E.'s written statement explained that they had been playing a "butt tag game" with J.G. and Greene and that J.G. was laughing as he was behind her. (E.E. Witness Statement, ECF No. 100-12.) M.G. stated that "nobody was really doing anything" other than playing chess and "a little bit of running around." (M.G. Witness Statement, ECF No. 100-14.) Another student, D.S., stated that she witnessed D.B. bend Greene over in a "sexual way," but that Greene was "laughing and smiling." (D.S. Witness Statement, ECF No. 100-15.) Greene has offered an account that differs from these witnesses, declining knowledge of what "butt tag" is and insisting that D.B. held her against her will while she tried to get away. (Greene Dep. 19:2–8, 22:24–23:1, 30:22–25; *see also* Greene Witness Statement.) J.G.'s witness statement aligned with Greene's account, explaining that Greene was "dry hump[ed] . . . against her will." (J.G. Witness Statement.)

On May 14, 2015, Procope and Lynne Jones reviewed video footage collected from the school hallway. (Peggy Jones May 26, 2015 Email.) The hallway video showed the dean of students outside the classroom but failing to check in on the students. (Peggy Jones Dep. 183:13–184:6.) It also showed D.B. entering the classroom. (*Id.* 184:7–12.) Procope provided Detective Hoffman with a copy of the hallway footage on May 15, 2015. (Defs.' SOF ¶ 46 & Pl.'s Resp.)[7] The school retrieved the Snapchat video of the incident from a student on May 19, 2015. (Peggy Jones May 26, 2015 Email.) This video was reviewed and forwarded to the police. (*Id.*) Based on her student interviews and review of the video footage, Procope closed her investigation on May 26, 2015, concluding that a sexual assault had not occurred. (Procope Aff. ¶ 6–8, ECF No. 99-12.)

### e. Post-Incident Accommodation of Greene and Disciplinary Response

On May 13, 2015, Academy Director Kathryn Procope filled out a discipline packet for D.B., which included a suspension notice. (D.B. Discipline Packet Checklist & Suspension Notice, ECF No. 101-4.) This notice indicated that D.B. was to serve a nine-day suspension from May 14, 2015 to May 27, 2015, with a recommendation for expulsion. (*Id.*) Given the results of the school's investigation, defendants ultimately decided not to expel D.B. for the incident. (Peggy Jones Dep. 182:11–18.)

The parties dispute whether D.B. actually served his nine-day suspension, with defendants claiming that he did and Greene asserting he did not. (Defs.' Reply at 6, ECF No. 101; Pl.'s SOF ¶ 14.) D.B.'s attendance records indicate that he attended class for the rest of the school year, but there are contemporaneous emails implying that these records are inaccurate. (*See* D.B. Attendance Record 2014–15, ECF No. 100-7; Waller May 26, 2015 Email, ECF No.

---

[7] This hallway video was not provided to the Court. There is no indication that the parties dispute its contents.

101-4.) What is undisputed is that Greene did not have any contact with D.B. for the remainder of the school year. (Defs.' SOF ¶ 37 & Pl.'s Resp.) She also had no contact with E.E. after the incident. (Greene Dep. 46:3–10.)

Greene did not return to her regular classes for the remainder of her sophomore year. (Defs.' SOF ¶ 27 & Pl.'s Resp.) Greene completed her school assignments from home for the school year's remaining three weeks. (Greene Dep. 62:13–63:10; Defs.' SOF ¶ 31 & Pl.'s Resp.) SSST coordinator Lynne Jones delivered and picked up work packets from Greene's home. (Greene Dep. 63:3–10.) Greene did not attend classes or review sessions during those weeks, but she did return to school a few times to attend an AP test, a field trip, and final exams. (*Id.* 62:13–63:2; Lynne Jones May 26, 2015 Email.)

Greene took her AP World History exam at the Academy on May 14, 2015. (Defs.' SOF ¶ 19 & Pl.'s Resp.) She did not encounter D.B. at school that day. (*Id.*) During a break in the AP exam, a female student, D.S., approached Greene and they had a two-to-three-minute conversation. (Greene Dep. 51:19–53:5.) During this conversation, D.S. told Greene "that it was [her] fault [D.B. and E.E.] couldn't take their AP test," that Greene "wanted it to happen," and that Greene had "snitched on them." (*Id.* 52:18–22.) After the AP test, Greene participated in a meeting with her mother and Lynne Jones, during which she described the comments that D.S. had just made to her. (*Id.* 54:15–21.) Greene and her mother also met with the school's counselor, Dr. Millet, who gave them contact information for Community Connections, an organization that works with people who have experienced sexual abuse and trauma. (Defs.' SOF ¶¶ 21–22 & Pl.'s Resp.; Millet Dep., ECF No. 99-11 at 10:9–22.) The school reprimanded D.S. the next day for discussing the incident with Greene, and D.S. did not approach Greene about the incident again. (Lynne Jones May 26, 2015 Email; Greene Dep. 98:21–99:8.)

On May 15, 2015, Greene returned to school to attend a field trip at Medieval Times. (Defs.' SOF ¶ 26 & Pl.'s Resp.) J.G.'s mother, Thomas, attended the field trip to supervise the girls. (Wells Dep. 39:2–5, ECF No. 100-5.) During this field trip, M.G.—who had recorded the Snapchat video of the incident—made a comment to Greene that Greene "wanted it to happen" and said, "I don't know why you acting like this." (Greene Dep. 55:20–56:14.) It is disputed whether this comment was reported to the school. Greene's mother, Wells, testified that J.G.'s mother, Thomas, reported the comments. (Wells Dep. 38:15–39:8.) In contrast, Lynne Jones wrote in an email that Thomas had told the school "nothing occurred" with M.G. on the field trip. (Lynne Jones May 26, 2015 Email.) Greene has stated that M.G. never raised the May 12 incident to her again after the comment at the field trip. (Greene Dep. 98:21–99:8.)

Greene also returned to the school to attend final exams. (*Id.* 62:20–24.) Greene took her tests in a private conference room, away from the other students. (*Id.* 64:22–65:24.) The only time that Greene alleges she was in the school during her sophomore year after May 12 and came close to encountering D.B. or E.E. was one day when she was there to take an exam. (*Id.* 66:14–67:17.) On that day, Lynne Jones told Greene that D.B. was in the building and had Greene stay in her office for "a little while" until D.B. left. (*Id.* 66:17–67:10, 120:21–121:7.) Lynne Jones also called Greene's mother, Wells, to let her know that D.B. was in the building, that the school did not want D.B. to have contact with Greene, and that Greene was staying in Jones' office until he left. (*Id.*) Greene and D.B. did not have any contact on that day, with Greene leaving Lynne Jones' office once the "coast was clear." (*Id.* 66:22–67:6; *see also* Defs.' SOF ¶ 37 & Pl.'s Resp.)

Greene returned to regular classes at the Academy for her junior and senior years. (Defs.' SOF ¶ 42 & Pl.'s Resp.) Greene received counseling services at an organization called

Safe Shores during her junior year. (Defs.' SOF ¶ 41 & Pl.'s Resp.; Greene Dep. 118:6–10.)

She has been diagnosed with PTSD as a result of the May 12 incident. (*See* Dr. Lubit Expert

Report at 11, ECF No. 100-25 (defense expert report regarding Greene's PTSD diagnosis).)

Greene recalls seeing D.B. only once in the subsequent years, when he passed her in the

hallway during her junior year. (Greene Dep. 95:12–22.) D.B. did not comment or gesture

towards her in any way as he passed her in the hallway. (*Id.* 95:20–96:3.) No other students

brought up the incident during her junior or senior years, and Greene successfully graduated

from the Academy. (Defs.' SOF ¶¶ 42, 44 & Pl.'s Resp.)

### f. Defendants' Recordkeeping Policy

Defendants maintained electronic records regarding students' disciplinary history in its

PowerSchool software program. (Waller Dep. (Part I) 171:17–172:14.) Materials collected

during an investigation, such as witness statements, were kept in hard copy files. (*Id.* 180:18–

181:22.) There was no written policy regarding the retention of these hard copy files, nor was

there a policy regarding their destruction. (*Id.* 178:6–180:17.) Many records related to the May

12 incident, such as the students' written statements, were retained by the school. (*See* Witness

Statements.) However, some documents, such as Peggy Jones' personal notes during her

discussion with Shelby Greene, were not retained. (Peggy Jones Dep. 148:9–149:8.) There was

no school "policy to destroy any documents related to a student file or investigation." (Waller

Dep. (Part I) 180:15–17.) At the same time, Jones did not understand that school policy

mandated that she retain her "personal notes." (Peggy Jones Dep. 148:22–149:8.)

### g. Defendants' Sexual Harassment Training

Defendants' sexual harassment training for teachers consisted of going over the

Parent/Student Handbook with them. (Waller Dep. (Part II) 447:1–21.) The Handbook

contained a brief description of sexual offenses and a procedure for students to initiate a

complaint.  (Parent/Student Handbook 2014-2015 at 22, 27–28, ECF No. 100-35.)  Defendants'

training did not provide specific instructions for how teachers were supposed to report

harassment, although Friendship's 30(b)(6) designee testified that "it was the practice that all

offenses are reported to the principal."  (Waller Dep. (Part II) 410:6–9.)

## II.   PROCEDURAL HISTORY

On May 11, 2016, Tanya Wells and Yolanda Thomas initiated this suit on behalf of their

minor children, Shelby Greene and J.G. respectively, against the Academy, Friendship, and

Donald Hense (Friendship's CEO).  Wells and Thomas filed a First Amended Complaint on June

6, 2016, which defendants moved to dismiss on July 7, 2016.  The First Amended Complaint

raised six claims: 1) violation of Title IX (deliberate indifference to sexual harassment); 2)

violation of Title IX (retaliation); 3) violation of 42 U.S.C. § 1983; 4) Section 1983 liability

under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978); 5) gross negligence; and 6)

negligent infliction of emotional distress.  (First Am. Compl. ¶¶ 175–235, ECF No. 3.)  The

Court granted the motion to dismiss with respect to all claims but two:  the Title IX deliberate

indifference claim and the gross negligence claim.  *Wells v. Hense*, 235 F. Supp. 3d 1, 14

(D.D.C. 2017).  The Court also limited the gross negligence claim, restricting its scope to

defendants' actions after the May 12 incident had been reported to defendants.  *Id.*

On January 4, 2018, Yolanda Thomas, on behalf of her minor child J.G., filed a motion

for voluntary dismissal of her claims pursuant to Fed. R. Civ. P. 41(a)(2).  (Thomas Voluntary

Dismissal Motion, ECF No. 52.)  The Court granted this motion and dismissed all claims by

Thomas on behalf of J.G. with prejudice, subject to a stipulation reached by the parties.  (Jan. 24,

2018 Minute Order; Stipulation, ECF No. 59.)  Wells' claims on behalf of her daughter, Shelby Greene, remained.

After the opportunity for discovery, Wells filed a motion for leave to amend, seeking to add allegations in support of her Title IX claim, a pre-incident gross negligence claim and a negligent infliction of emotional distress claim.  (Pl.'s Mot. for Leave to File Second Am. Compl. at 5, ECF No. 66.)  The Court granted Wells leave to amend as to these three counts. (Mar. 29, 2018 Minute Order.)

On July 12, 2018, Wells moved to substitute her daughter Shelby Greene (formerly referred to in court filings as "S.G.") as the plaintiff in the case given that Greene had reached the age of majority.  (Mot. for Substitution of Pl. at 1, ECF No. 89.)  The Court granted this motion, at which time Shelby Greene became the sole plaintiff in this case.  (Aug. 6, 2018 Minute Order.)

On September 28, 2018, defendants Hense, Friendship, and Academy filed the present motion for summary judgment on all counts.  (*See* Defs.' Mot.)[8]  Greene filed an opposition, asking the Court to deny summary judgment—except with regard to the claims against Hense, as Greene conceded that her remaining claims should be prosecuted against defendant Friendship rather than Hense.  (Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp.") at 2, ECF No. 100.)

---

[8] Inexplicably, defendants moved for summary judgment not only as to the three counts that remain in the case (Title IX deliberate indifference, gross negligence, and negligent infliction of emotional distress), but also as to the three claims that the Court had previously dismissed (Title IX retaliation, Section 1983 claim, and *Monell* liability claim).  (*See* Defs.' Mot.)  The Court ignores as irrelevant those portions of defendants' motion that relate to the three claims that the Court dismissed in January 2017 and for which defendants were never granted leave to amend.

Defendants filed a reply in support of their motion for summary judgment on November 8, 2018. (*See* Defs.' Reply.)[9]

Given the parties' apparent confusion regarding the claims remaining in the case, *see supra* n.8, the Court ordered Greene to file a Third Amended Complaint that omitted the dismissed counts and omitted Hense as a defendant. (Order, ECF No. 103.) Greene filed a Third Amended Complaint on January 4, 2019, which omitted the dismissed counts but failed to omit Hense. (*See* Third Am. Compl., ECF No. 104.) Greene then filed a Fourth Amended Complaint that complied with the Court's Order in both respects. (Fourth Am. Compl., ECF No. 106.) The operative Fourth Amended Complaint contains one plaintiff, Shelby Greene, and two defendants, Friendship and the Academy. It presents three claims against both defendants: 1) violation of Title IX based on deliberate indifference to peer-to-peer sexual harassment (Count I); 2) gross negligence (Count II); and 3) negligent infliction of emotional distress (Count III). (*Id.* ¶¶ 164–223.)[10]

## ANALYSIS

The Court's analysis begins with Count I, plaintiff's Title IX claim, which is the only remaining federal claim. As described below, because the Court grants summary judgment to defendants on Count I, it will decline to exercise supplemental jurisdiction over the remaining

---

[9] After a discovery dispute related to Academy Director Kathryn Procope's deposition and a motion for sanctions by plaintiff (ECF No. 83), the Court offered the parties the opportunity to re-depose Procope and then supplement their summary judgment briefing after her deposition. (Order, ECF No. 103.) Neither party chose to make such a supplemental filing. (*See* Defs.' Notice re Suppl. Briefing, ECF No. 105.) Thus, the Court's summary judgment ruling is based on the motion, opposition, and reply that the parties had previously filed. (ECF Nos. 99, 100, 101.)

[10] After the summary judgment briefing was completed, defendants also filed a motion to strike portions of the Fourth Amended Complaint. *See supra* n.4.

state law claims (Counts II and III) and dismisses them without prejudice to their refiling in D.C.

Superior Court.

## I.    LEGAL STANDARD

Under Fed. R. Civ. P. 56(a), summary judgment should be granted "if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A "dispute about a material fact" is only "genuine" if

"'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

*Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004) (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986)). A defendant moving for summary judgment discharges his

burden if he has "identifi[ed] the ways in which the plaintiff has failed to come forward with

sufficient evidence to support a reasonable jury to find in her favor on one or more essential

elements of her claim." *Grimes v. D.C.*, 794 F.3d 83, 93 (D.C. Cir. 2015); *see also Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be

discharged by 'showing'. . . that there is an absence of evidence to support the nonmoving

party's case."). When considering a summary judgment motion, courts are required to "examine

the facts in the record" and draw "all reasonable inferences derived therefrom in a light most

favorable to the non-moving party." *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1193

(D.C. Cir. 2018) (citation and quotation marks omitted).

## II.    COUNT I:  TITLE IX CLAIM

Count I of Shelby Greene's Fourth Amended Complaint alleges that defendants

Friendship and Academy violated Title IX by exhibiting deliberate indifference to peer-to-peer

sexual harassment. (Fourth Am. Compl. ¶¶ 164–187.) Title IX provides that: "No person in the

United States shall, on the basis of sex, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court held in *Davis* that federal funding recipients can only be liable for private damages under Title IX for their own misconduct; they cannot be held vicariously liable for a student's assault on a peer. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640–41 (1999). "If a funding recipient does not engage in harassment directly" it can only be liable if "its deliberate indifference . . . cause[d] [students] to undergo harassment or [made] them liable or vulnerable to it." *Id.* at 644–45 (citation and internal quotation marks omitted).

In particular, a Title IX plaintiff must show that defendants were "deliberately indifferent to sexual harassment, of which they ha[d] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650. "[F]unding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. Courts may determine, in appropriate cases, whether a response is "'clearly unreasonable' as a matter of law." *Id.* at 649.

*Davis*' deliberate indifference standard "sets a high bar for plaintiffs to recover under Title IX." *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016). Schools are not deliberately indifferent simply because they have failed to "purg[e] their schools of actionable peer harassment" or because "administrators" did not "engage in particular disciplinary action." *Davis*, 526 U.S. at 648. "[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators," and "expulsion of every student accused

of misconduct involving sexual overtones" is not required in order to avoid liability for damages. *Id.* (citation omitted).

Based on the record before the Court, it concludes that plaintiff has proffered insufficient evidence to permit a reasonable jury to conclude that defendants were deliberately indifferent. Because plaintiff cannot establish the "deliberate indifference" element of a Title IX student-on-student harassment claim, the Court need not reach the issue of whether the other elements of such a claim are met here.[11] When this Court denied defendants' motion to dismiss plaintiff's Title IX deliberate indifference claim, it reasoned that it was possible that the following allegations in the complaint, if true, could constitute deliberate indifference: if "defendants' response to the reported incidents was to promise an investigation and appropriate consequences, but then to fail to conduct a proper investigation, to punish the perpetrators, to ensure that the victims were protected from future assaults, and to prevent the subsequent harassment by other students." *Wells*, 235 F. Supp. 3d at 9. Now that discovery has concluded, many of these allegations have been disproven, and thus plaintiff's claim cannot survive summary judgment. *See Grimes*, 794 F.3d at 94 (A plaintiff "cannot rely on the allegations of her own complaint in response to a summary judgment motion, but must substantiate them with evidence.")

Defendants conducted an immediate investigation into the May 12 incident, reviewing available video footage and interviewing multiple students present at the time of the incident within days of plaintiff's reporting. (*See* Witness Statements; Peggy Jones May 26, 2015 Email.) This is not a case of a school dragging its feet and delaying looking into allegations of sexual assault. *Compare Raihan v. George Washington Univ.*, 324 F. Supp. 3d 102, 106, 111–12, 115

---

[11] In particular, the Court offers no opinion as to whether the occurrences described herein are sufficiently "severe, pervasive, and objectively offensive" to meet *Davis'* standard, nor whether Greene was "deprive[d]. . . of access to . . . educational opportunities or benefits." *Davis*, 526 U.S. at 650.

(D.D.C. 2018) (dismissing a Title IX claim where "the University conducted fact-finding quickly") *with Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 31–32 (D.D.C. 2018) (finding a months-long delay in the school's response sufficient to plausibly allege that the school was deliberately indifferent).

Plaintiff argues that the investigation could have been more robust, with more students interviewed. (*See* Pl.'s Opp. at 18; Pl.'s Resp. to Defs.' SOF ¶ 33.) But the law does not require a perfect investigation; only one that is not "clearly unreasonable." *Doe v. Emerson Coll.*, 271 F. Supp. 3d 337, 355 (D. Mass. 2017) (citing *Davis*, 526 U.S. at 649). Although it is disputed how many students were present in the classroom, the school interviewed five students, including the two victims, two bystanders, and E.E., the second assailant. (*See* Witness Statements.) It not only undertook an immediate investigation itself, but it also promptly contacted the police and facilitated the police's ability to conduct an additional investigation. (*See* Defs.' SOF ¶ 11 & Pl.'s Resp.; Hoffman Dep. 18:9–14.) The timing and scope of the school's investigation is sufficient to prevent any reasonable juror from concluding it to be clearly unreasonable. *See Doe*, 271 F. Supp. 3d at 355–56.

Plaintiff argues that the investigation was also flawed because of who conducted it: Kathryn Procope instead of Tamika Maultsby. (*See* Pl.'s Opp. at 18.) Maultsby was allegedly defendants' designated person responsible for overseeing investigations pursuant to Title IX during the 2014–2015 school year, but she was not involved in the school's investigation into the May 12 incident. (Waller Dep. (Part II) 208:5–22; Peggy Jones Dep. 142:1–5; Maultsby Dep. 84:4–7, 16–20.) Yet, Maultsby's absence from the investigation does not establish deliberate indifference. Even if failing to involve Maultsby constituted non-compliance with defendants' internal procedures, a school's failure to comply with its own internal policies does not itself

establish deliberate indifference, just as a school's failure to comply with federal regulations does not do so. *See Raihan*, 324 F. Supp. 3d at 109–10 (dismissing a Title IX clam despite a university's alleged failure to follow a sexual assault policy it had adopted); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998) (concluding defendant's "alleged failure to comply with . . . regulations . . . [did] not establish the requisite . . . deliberate indifference").

Defendants ensured that plaintiff was protected from future assaults by successfully separating her and D.B. for the remainder of the school year. (Defs.' SOF ¶ 37 & Pl.'s Resp.) Plaintiff returned to the school several times during the weeks subsequent to the May 12 incident for an AP test, final exams, and a school field trip. (*See* Lynne Jones May 26, 2015 Email.) At no time during any of these visits to the school did she have any contact with D.B. (Defs.' SOF ¶ 37 & Pl.'s Resp.) In particular, the school took measures to protect plaintiff from any harassment while she was at school to take exams, allowing her to complete the tests in a private conference room. (Greene Dep. 64:22–65:24.) During the one time, post-incident that plaintiff can recall D.B. being at school at the same time as her during her sophomore year, the school took successful steps to prevent them from coming into contact. The school notified plaintiff (and called her mother) to explain that D.B. was temporarily in the building, provided plaintiff with a safe space in Lynne Jones' office to avoid him, and notified plaintiff as soon as D.B. was no longer there so that she could leave. (Greene Dep. 66:17–67:6, 119:2–9.) This cannot reasonably be construed as deliberately leaving plaintiff vulnerable to further attack. *Compare Stiles*, 819 F.3d at 849, 851 (rejecting a Title IX claim where the school took proactive steps to separate plaintiff from his harassers) *with Cavalier*, 306 F. Supp. 3d at 32–35 (concluding that a Title IX claim could survive a motion to dismiss where the school refused to intervene to prevent plaintiff's harasser from continuing to contact her).

Defendants also did not idly permit plaintiff to be harassed by other students about the incident. The school was made aware of one student, D.S., who made a brief comment to plaintiff during an AP test break, and the school immediately reprimanded that student, successfully preventing D.S. from discussing the incident with plaintiff again. (*See* Lynne Jones May 26, 2015 Email; Greene Dep. 98:21–99:8.) A second, brief comment by a different student, M.G., also never re-occurred. (Greene Dep. 98:21–99:8.) It is disputed whether M.G.'s one-time comment was ever reported to the school. (Lynne Jones May 26, 2015 Email; Wells Dep. 38:15–39:8.) Yet this factual dispute is immaterial, as schools are not liable under Title IX for "simple acts of teasing," even where they are reported. *Davis*, 526 U.S. at 651–52.

The parties' largest factual dispute regards whether D.B.'s nine-day suspension following the May 12 incident was actually enforced, but this dispute does not foreclose summary judgment. Defendants are entitled to summary judgment even if plaintiff's assertion that the suspension was not enforced is true. *See Barrer v. Women's Nat. Bank*, 761 F.2d 752, 757 (D.C. Cir. 1985) (discussing the appropriateness of summary judgment where a factual conflict is "without legal probative force even if true") (citation omitted). Plaintiff was not entitled to demand that the school impose on D.B. a specific punishment in response to the May 12 incident. *See Davis*, 526 U.S. at 648 (explaining that the deliberate indifference standard does not require "that administrators must engage in particular disciplinary action"); *Johnson v. Indep. Sch. Dist. No. 47*, 194 F. Supp. 2d 939, 948 (D. Minn. 2002) ("[T]he deliberate indifference standard does not give aggrieved parties a right to particular remedial demands."). Instead, the question is whether the school's response left plaintiff vulnerable to further harassment. *Davis*, 526 U.S. at 644–45 ("[A] funding recipient . . . may not be liable for damages unless its

deliberate indifference . . . cause[s] [students] to undergo harassment or makes them liable or vulnerable to it.") (citation and internal quotation marks omitted).

The school's disciplinary response to D.B.'s May 12 behavior did not leave plaintiff vulnerable to harassment, given that it is undisputed that the school took successful steps to prevent further interaction of any kind between plaintiff and D.B. for the remainder of the school year. (Defs.' SOF ¶ 37 & Pl.'s Resp.) Furthermore, plaintiff reports no further harassment by D.B., E.E., or any other student in her subsequent junior and senior years at the Academy. (Defs.' SOF ¶¶ 42–44 & Pl.'s Resp.; Greene Dep. 95:12–100:6.) Thus, the school's response was not deliberately indifferent, even if, *arguendo*, it were true that the school did not successfully carry out its suspension of D.B. in the immediate aftermath of the May 12 incident.

Plaintiff also places much emphasis on D.B.'s prior disciplinary history at the Academy, arguing that defendants had actual notice of D.B.'s propensity to engage in inappropriate or non-consensual sexual behavior but were deliberately indifferent to it. (Pl.'s Opp. at 17.) On the contrary, the record indicates that the school took these issues seriously, repeatedly suspending D.B. (*See* D.B. PowerSchool Log 1–4.) It appears that the punishments for D.B.'s disruptive behavior—much of which consisted of D.B.'s general disobedience or fights with male students unrelated to gender—had some effect, as D.B. did not have any disciplinary incidents for the three months preceding May 2015. (*Id.* at 1 (showing no incident between February 10 and May 11, 2015).) Furthermore, "the fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by [the school] at the time." *Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007). In *Stiles*, the Sixth Circuit explained that a school was not deliberately indifferent where its response to prior instances of harassment "consisted of multiple

investigations, several in-school suspensions, and class scheduling that separated [plaintiff] from his harassers," even though these "remedial measures did not eliminate [plaintiff's] problems with other students." 819 F.3d at 849–50. Similarly, the fact that defendants' punishments for D.B.'s prior behavior—which were tailored to the severity of the offense and included many out-of-school suspensions—did not entirely eliminate D.B.'s disruptive conduct does not indicate that the school was deliberately indifferent to his behavior given the circumstances known by the school at the time.[12]

Plaintiff is right to criticize the school for leaving the students unattended in a classroom for an entire class period. Defendants' witnesses have conceded that this should not have happened. (*See* Peggy Jones Dep. 183:22–184:2) (Academy principal conceding that the dean of students was "100 percent irresponsible" because he "never checked" inside the classroom); *id.* 233:1–14 (indicating that the teacher, Harris, received a write-up in his HR file for leaving without permission on May 12).) However, the evidence establishes that the Academy did not intend to leave the students alone; the students were left unattended due to a series of mistakes:

---

[12] Plaintiff's opposition cites to earlier cases from the First and Sixth Circuit whose language might be interpreted to imply broader liability for a school's use of disciplinary measures that failed to successfully eliminate harassment. (*See* Pl.'s Opp. at 17); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (explaining "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances"); *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) (stating "if [a school] learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability"); *Canty v. Old Rochester Reg'l Sch. Dist.*, 66 F. Supp. 2d 114, 116 (D. Mass. 1999) (quoting *Wills*). Subsequent cases in those Circuits have explained that such language should not be taken to mean that hindsight can be used to impose liability where a school's reasonable disciplinary responses later turned out to be ineffective in completely eliminating the problematic behavior. *See Porto*, 488 F.3d at 74 ("The test for whether a school should be liable under Title IX for student-on-student harassment is not one of effectiveness by hindsight."); *Stiles*, 819 F.3d at 850 (distinguishing *Vance*, explaining that in *Vance* the school had only utilized a known "ineffective practice of 'talking to the offenders' without imposing any discipline").

The teacher, Gregory Harris, left the school without telling anyone or securing a substitute, and the dean of students and security guard both failed to follow school policy when they did not check each classroom to ensure that an adult was present. (*See id*. 217:17–18; Lynne Jones May 26, 2015 Email.) These mistakes by school employees, which violated the school's existing policies, do not qualify as deliberate indifference. *See, e.g.*, *Cavalier*, 306 F. Supp. 3d at 26 ("[M]ere negligence is not enough; the plaintiff must demonstrate that the [school] was 'deliberately indifferent.'") (citation omitted).[13]

Plaintiff places great emphasis on a line from an email sent by principal Peggy Jones on May 14, 2015, in which she indicated that she intended to have a conversation with other school personnel "about the shortage in security guards." (Peggy Jones May 14, 2015 Email; *see also* Pl.'s Opp. at 15, 23.) However, there is no indication that a lack of security guards affected plaintiff or influenced what occurred on May 12 in the unattended classroom. After all, there was a security guard on the floor where the geometry classroom was at the time of the incident. (Peggy Jones Dep. 217:2–7.) The problem was that the security guard failed to fulfill his responsibility of checking the classroom, not that one was absent due to any type of shortage. Furthermore, plaintiff has not shown that the school knew that a shortage of security guards would create a high risk of sexual harassment. *See Porto*, 488 F.3d at 74 (concluding that a failure to provide a teacher's aide to accompany a student did not display deliberate indifference because plaintiff could not show that the school knew that absent the aide's accompaniment,

---

[13] This Court takes no position as to whether defendants' behavior constituted negligence or gross negligence. As explained *infra*, the Court dismisses plaintiff's negligence-related claims without prejudice to their refiling in D.C. Superior Court. If, *arguendo*, plaintiff is able to prevail on her claim that defendants displayed gross negligence, this does not change the conclusion that plaintiff cannot meet the demanding "deliberate indifference" standard that the Supreme Court has articulated for Title IX student-on-student sexual harassment claims.

"there was a high degree of risk that [the victim] would be subject . . . to inappropriate sexual behavior by [the assailant].").

Plaintiff also faults the defendants' recordkeeping policies because there was no written policy regarding retention of hard copy materials collected during a sexual assault investigation. (Pl.'s Opp. at 18.)  Plaintiff tries to draw an analogy to *Hill*, where the Eleventh Circuit found the school's recordkeeping policy so deficient that the school could not adequately monitor the reoccurrences of sexual harassment perpetrated by a given student.  (Pl.'s Opp. at 18); *Hill v. Cundiff*, 797 F.3d 948, 974 (11th Cir. 2015).  In *Hill*, the school had a policy of periodically destroying written records and wrote only barebones, cursory notes in its electronic system.  797 F.3d at 958–59, 974.

Defendants' recordkeeping here is not comparable to that in *Hill*.  The entries in D.B.'s PowerSchool record were sufficiently descriptive to permit the school to monitor and track D.B.'s misbehavior.  *Compare* D.B. PowerSchool Log (where each incident has a detailed paragraph describing what happened, such as the May 12 incident where the "dry hump" of plaintiff is described) *with Hill*, 797 F.3d at 974 (where the school's barebones records mischaracterized a rape as "[i]nappropriate[ly] touching a female in a boys' bathroom" and propositioning students for sex as a mere "distraction" that "disrupt[ed] . . . learning").  Furthermore, while defendants' document retention policies were less specific than might be desirable, there is no evidence that the school encouraged its teachers to destroy written disciplinary records.  *Compare* Waller Dep. (Part I) 180:15–17 ("It was not our policy to destroy any documents related to a student file or investigation.") *with Hill*, 797 F.3d at 974 (concluding "a reasonable jury could find the [defendant's] decision to continue shredding students'

disciplinary paper records at the end of each year impeded school officials' ability to adequately respond to sexual harassment allegations").

Lastly, plaintiff's critique of defendants' employee sexual harassment training does not salvage its claim. (*See* Pl.'s Opp. at 19.) It appears true that defendants' sexual harassment training for teachers did not specify how to report harassment. (*See* Waller Dep. (Part II) 410:6–9, 447:1–21; Parent/Student Handbook 2014-2015 at 22, 27–28.) While this evidence suggests that defendants' training was less than ideal, plaintiff must do more than point out imperfections. *See Doe*, 271 F. Supp. 3d at 357. Plaintiff "has not shown how any alleged deficiencies cause[d] [her] any actual harm." *Id.* While there was no written policy that sexual harassment be reported to the principal, in the present instance the May 12 incident was reported promptly to the principal, on the same day that plaintiff first reported it. (*See* Waller Dep. (Part II) 410:6–9; Lynne Jones May 26, 2015 Email.) And, as the Court has concluded, defendants did not respond unreasonably to plaintiff's reporting of the May 12 incident, and it is not apparent how further training would have—or should have—altered any school official's response.

Considering plaintiff's arguments collectively, it is apparent that she "has failed to come forward with sufficient evidence to support a reasonable jury to find" that defendants displayed deliberate indifference. *Grimes*, 794 F.3d at 93. *Davis*' deliberate indifference standard "sets a high bar for plaintiffs to recover under Title IX," *Stiles*, 819 F.3d at 848, which plaintiff has failed to meet. This high bar does not mean that courts are unsympathetic to the plights of individuals who allege they have been sexually assaulted at their place of learning. *See*, *e.g.*, *Raihan*, 324 F. Supp. 3d at 113 (recognizing that "[s]exual assault victims endure enormous pain"). But, because Title IX does not allow a school to be held vicariously liable for a student assailant's actions, defendants cannot be liable for D.B.'s actions towards plaintiff under Title

IX, even if D.B.'s actions are alleged to have irreparably impacted plaintiff's life. *See Davis*,

526 U.S. at 640; (Dr. Lubit Expert Report at 11, 15 (diagnosing plaintiff with PTSD as a result of

the May 12 incident and describing the incident's lasting effects on plaintiff).) Regardless of

D.B.'s actions—however reprehensible they may have allegedly been—*defendants'* actions are

not of the kind for which liability attaches under Title IX. The Court thus grants summary

judgment to defendants on Count I of the Fourth Amended Complaint.

## III.    COUNTS II & III:  GROSS NEGLIGENCE & NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Plaintiff brings two state law claims in addition to her Title IX claim:  gross negligence

and negligent infliction of emotional distress. (Fourth Am. Compl. ¶¶ 188–223.) A district court

may decline to exercise supplemental jurisdiction over state law claims against non-diverse

defendants where all federal claims have been dismissed. *See* 28 U.S.C. § 1367(c)(3); *Mead v.

City First Bank of DC, N.A.*, 616 F. Supp. 2d 78, 81 (D.D.C. 2009). "[I]n the usual case in which

all federal-law claims are dismissed before trial, the balance of factors to be considered under the

pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point

toward declining to exercise jurisdiction over the remaining state-law claims." *Shekoyan v.

Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005) (citation omitted). Given these factors, the Court

will utilize its discretion to decline jurisdiction over plaintiff's gross negligence and negligent

infliction of emotional distress claims. The Court dismisses Counts II and III of the Fourth

Amended Complaint without prejudice to plaintiff's refiling of these claims in D.C. Superior

Court.

**CONCLUSION**

For the reasons stated above, the Court grants summary judgment to defendants on Count I of the Fourth Amended Complaint and dismisses Counts II and III without prejudice.  A separate Order accompanies this Memorandum Opinion.



ELLEN S. HUVELLE
United States District Judge

Date:   February 25, 2019